## STATE v. OTIS BAGLEY.

(Filed 7 January, 1949.)

**1. Homicide § 25—**

The testimony of the State's witnesses placing defendant at the scene at the time of the shooting and permitting the reasonable inference that defendant, pursuant to a family altercation, fired the shot which killed deceased, though contradicted by defendant's evidence, *is held* sufficient to overrule defendant's motion to nonsuit.

**2. Criminal Law § 42f—**

The State cannot discredit its own witness by introducing testimony of previous statements made by her inconsistent with her testimony upon the stand.

**3. Criminal Law § 42d—**

Where testimony of previous statements is introduced by the State for the purpose of corroborating its witness, and such statements are inconsistent with and repugnant in material aspects to the witness' testimony upon the trial, such statements tend to discredit the witness, and therefore are incompetent for the purpose of corroboration, nor may such statements be admitted under instructions that they be considered only to the extent that they corroborate the witness, since the jury should not be given the task of eliminating the contradictory declarations.

APPEAL by defendant from *Pless, J.,* at March Criminal Term, 1948, of DURHAM.

Criminal prosecution upon a bill of indictment charging defendant with the murder of one William Coleman.

The solicitor for the State announced that he would not ask for a verdict of guilty of murder in the first degree, but would ask for a verdict of guilty of murder in the second degree, or of manslaughter, as the evidence might warrant.

Defendant pleaded not guilty, and relied upon alibi.

Upon the trial in Superior Court the State offered the testimony of the members of the Cheatham family, Lewis and his wife Pansy, and their twelve-year-old daughter Eldria, next door neighbors to William Coleman and his wife Viola, and her daughter Erline. They lived on South Street in the city of Durham, North Carolina. From their testimony this narrative appears: William Coleman, called Bush, came to his death on the night of 12 September, 1947, as result of a bullet wound in his chest,—he being found on the porch of his home, and dying soon thereafter. About 11 o'clock p.m., William Coleman and his wife had an "argument" at their home. Her screaming waked the Cheathams. While William was turning out the lights in the house Viola went out the front door, and down South Street. "Pretty soon" Frank and Curtis Bagley, brothers of Viola, and of defendant Otis Bagley, and their girl friends came up in a cab and got out and started arguing with Bush.

A "scrap" ensued there on the porch, and Erline, who was there also, got cut on her arm. Bush had a knife. Lewis Cheatham came as peace-maker, parted them, and took Erline to hospital. The others left too. Only Bush remained at the house. Lewis returned to his home from the hospital. Soon thereafter Bush came to the Cheatham home and tried to borrow a gun. Failing in this, he returned to his home. Soon thereafter two cars stopped in front of his home, and people got out.

As to subsequent events Pansy Cheatham and Eldria Cheatham as witnesses for the State gave their respective versions. Pansy Cheatham testified: "People got out and a great argument, you know, and this sister said to him, said 'Don't shoot Otis,' and immediately after that there were shots. The sister I was referring to was Geneva Perry, Otis Bagley's sister . . . I could not see the front porch of William Coleman's house. After the gun fired I heard footsteps, scrambling, down the steps and the cars started and they went up the street, all left . . . My husband returned home not long after the shooting . . . and he went for the officers . . . I know Otis Bagley. I know his sister Geneva. I did not hear Otis make any statement or say anything at all that night. I only heard his sister hollering over there." Then, on cross-examination, this witness continued: "I heard Geneva say, 'Don't shoot Otis.' That is all I heard . . . I was facing away from the Coleman house."

And Eldria Cheatham testified as to such subsequent events: "Two cars drove up and I saw their headlights. I was in my mother's room across the bed. I saw somebody get out of the cars. I recognized Otis Bagley and Geneva Bagley. I recognized Otis by his shirt and glance of his face. I then heard some people fussing. They were cursing. I knew Otis Bagley before this time. I know Otis' voice. Otis asked Bush why he was cutting up people. Bush told him to go away. Nothing else was said by Otis. I heard Geneva say, "Don't shoot Otis." Then I heard two shots. Then the people who were on the porch came down the steps and got in their cars and drove off. I did not see or hear anything else over there that night . . . I later told my mother who I had seen. I told her I saw Otis and Geneva." This witness, on cross-examination, continued in pertinent part: "I testified in Recorder's Court that the only way that I knew who any of the people were was by hearing their voices. I say the same thing now. I also testified in Recorder's Court that I heard someone say 'Don't shoot Otis,' and then I heard someone say 'Come again,' and that was all I testified in Recorder's Court that I heard. I testify now that that is all I heard said." Then on re-direct examination the witness was asked this question: "Did you—were you able to determine—do you testify now you were able to determine the identity of any of these people? Were you able to see any of these people so that you knew them?" (Objection. Exception 5.) The witness answered: "I

don't think so. O, yes, Otis." She then continued: "Otis was coming up the steps when I recognized him . . . I did not recognize anyone else other than Otis as they left the car and came toward the house." And, still on re-direct examination, the witness was asked this question: "I will ask you if you didn't also testify that there were other things said out there that night when you testified in Recorder's Court?" (Objection. Exception 6), to which she replied "Yes." And on re-cross-examination, the witness said: "I know what kind of shirt Otis had on that night; he had on a polo shirt."

Thereafter the State offered as witness C. W. Rigsbee, a member of the detective force of the city of Durham, as to declarations made by Eldria Cheatham on the morning of 13 September. He was asked: "What, if anything, did she tell you as to what she knew with reference to this killing? I am offering it for the purpose of corroborating Eldria Cheatham if it does corroborate her." In answer thereto the witness read from a written statement a recitation of events leading up to the shooting, and then, quoting her, continued: "Geneva and Otis were out there as I heard their voices. Otis told Bush he was acting bad, cutting up people like that, and Otis said 'Take off those glasses and put that knife down and I will shoot you,' and Geneva said, 'Don't shoot, don't shoot,' and Bush said, 'You all go ahead, go ahead,' and then I heard Bush say 'What are you doing with that pistol,' and then I heard two shots fired and all the people ran off the porch and got into the car and Geneva's car, and all of them left . . ." Defendant moved to strike the answer made by the witness. Denied. Exception No. 7. The court instructed the jury: "The motion is denied, but the court repeats that you will not consider for any purpose any statement of the witness as to what Eldria told him, except as it may tend to corroborate or support her testimony while she was on the stand. The court recalls at least one or two parts of that statement read by the officer that is not in accord with the testimony of Eldria in this case while she was on the stand, and of course that part of it is not competent and will not be considered by you."

Thereupon defendant entered motions, which the court denied, as follows: (1) That the court delete from the statements those portions which are not corroborative; (2) that the entire statement of witness be stricken as being unresponsive; and (3) that the court specify the portions of the officer's testimony which is not in corroboration or substantiation of Eldria's testimony. To the denial of these motions exceptions 8, 9 and 10 relate.

Also for purpose of corroborating the State's witness, Pansy Cheatham, the State, through the same witness, officer Rigsbee, read into the record a previous statement she had made. Exception 11. And to denial of his motions (1) to strike those portions which are not corroborative, and

(2) to strike the whole as being unresponsive, defendant excepts. Exceptions 12 and 13.

Defendant, on the other hand, reserving exception to denial of his motion for judgment as in case of nonsuit, entered when State first rested, offered evidence tending to show that on the night in question he was at work at Third Fork Inn operated by his brother-in-law James Perry and his wife, Geneva Perry, a mile or more from the Coleman home. And Viola Coleman, wife of deceased, and sister of defendant, as witness for defendant, testified in support of his plea of alibi,—stating that she shot her husband under circumstances detailed by her. Defendant renewed his motion for a dismissal of the prosecution and a directed verdict of not guilty, at close of all the evidence, and upon denial of it, excepted.

Verdict: Guilty of the crime of manslaughter.

Judgment: Confinement in the Central Prison at Raleigh, N. C., for a period of not less than nine years nor more than twelve years, to be worked under the supervision of the State Highway and Public Works Commission at hard labor.

Defendant appeals therefrom to Supreme Court, and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Victor S. Bryant and Robert I. Lipton for defendant, appellant.*

WINBORNE, J. Defendant presents for decision, first, exception to the ruling of the court in denying his motions for judgment as in case of nonsuit, and second, numerous exceptions to the admission of evidence.

As to the first: While there is conflict of testimony, as between that offered by the State, and that offered by the defendant, we are of opinion and hold that the evidence offered on the trial below, taken in the light most favorable to the State, as we must do in passing upon such motions, is sufficient to make out a case for consideration by the jury. The evidence favorable to the State places defendant on the scene at the time of the shooting, and there is evidence from which the jury may reasonably infer that defendant did the shooting.

But as to the second, we are of opinion that exceptions 7, 8, 9 and 10 considered together show error prejudicial to defendant. The admission of the evidence as to previous contradictory declarations of the State's witness Eldria Cheatham is erroneous in two aspects: (1) It violates the well settled rule of evidence that a party cannot discredit his own witness. *S. v. Melvin,* 194 N. C. 394, 139 S. E. 762; *S. v. Freeman,* 213 N. C. 378, 196 S. E. 308, and cases cited. See also Section 40 of Stansbury on North Carolina Evidence. (2) It exceeds the limits of the rule that, in the event the credibility of a witness is impaired, his previous similar

statements are admissible. For, as stated in *S. v. Melvin, supra,* Brogden, *J.,* writing for the Court: "The rule has never been expanded far enough to permit the introduction of previous contradictory statements, because in the very nature of things this would weaken credibility rather than strengthen or confirm it." See also *S. v. Lassiter,* 191 N. C. 210, 131 S. E. 577, where the Court said: "In no aspect of the law of evidence can contradictory evidence be used as corroborating, strengthening or confirming evidence."

The case of *S. v. Melvin, supra,* is very similar to the one in hand. Here, as in the *Melvin case,* the narrative of officer Rigsbee, in the particulars quoted hereinabove, is not a narrative "of previous similar declarations" made by Eldria Cheatham, but rather of previous dissimilar and contradictory statements made by Eldria Cheatham as tending to show how the killing occurred. "This is not permissible under the rules of law applicable to the trial of criminal cases." *S. v. Melvin, supra.*

Moreover, it may be noted that in the *Melvin case* the trial judge stated to the jury that the evidence of Dr. Brewer (C. W. Rigsbee in the present case) was offered "only for the purpose of corroborating Mary Bradley" (Eldria Cheatham in the present case). And, continuing, "You will only consider that part of his evidence which you find tends to corroborate Mary Bradley, if you find any of it does, and you are not to consider any part of it that does not corroborate her." Then this Court, after noting certain variations, said: "This testimony of Dr. Brewer, therefore, contradicts the testimony of Mary Bradley, another State's witness, in material particulars, which, if believed, totally destroyed the theory of the defendant that the cutting was accidentally done." Error was found, and a new trial granted.

See also *S. v. Jackson,* 228 N. C. 656, 46 S. E. (2) 858, where, referring to the charge, this Court stated, "While no particular harm seems to have resulted from the preliminary statement in the instant case, it is not to be approved as a general practice. The trial court ought not to submit his charge to the jury for elimination of inconsistencies." In like manner the trial judge should not submit to the jury the task of eliminating patent contradictory declarations from those tending to corroborate testimony given on the stand.

The same principle is applicable to the testimony of the same officer as to previous statements made to him by the State's witness Pansy Cheatham to which exceptions 11, 12 and 13 relate.

As the case must go back for retrial, other exceptions need not be considered.

Hence, for error pointed out, let there be a

New trial.