STATE OF NORTH CAROLINA v. HAROLD WILLIAMS

No. 14

(Filed 10 November 1971)

1. Rape § 18— assault with intent to commit rape — instructions — expression of opinion

Trial court's instructions in a prosecution for assault with intent to commit rape did not constitute an expression of opinion as to the sufficiency of the evidence or as to the verdict which the jury should return. G.S. 1-180.

2. Criminal Law § 163— instructions — misstatement of contentions — time of objection

Any misstatement of the contentions of the parties must be called to the attention of the court at the time it is made, so as to permit a correction, or such misstatement will be deemed waived.

3. Constitutional Law § 36— cruel and unusual punishment — imposition of maximum sentence

It was not cruel and unusual punishment for the trial judge to impose the maximum sentence authorized by statute upon defendant's conviction of assault on a female with intent to commit rape. G.S. 14-22.

4. Criminal Law § 75— admissibility of written confession — in-custody interrogation — defendant's request for parents — subsequent confession

A written confession signed by a 16-year-old defendant, together with his written waiver of counsel, was properly admitted in evidence on the trial for the offense of assault with intent to commit rape, where (1) the defendant voluntarily went to the police station at the request of the police; (2) the defendant, after being fully advised of his constitutional rights and of the matter under investigation, signed the written waiver of counsel; (3) the officer ended his interrogation when defendant requested an attorney but then changed his mind and requested his parents; and (4) the defendant, in the presence of his parents, who told him to tell the truth, made an oral confession to the crime and thereafter signed a written statement of the confession.

5. Criminal Law § 62— evidence relating to polygraph test — harmless error

Admission of an officer's testimony that the defendant had agreed to take a polygraph test, which was administered to him, did not constitute reversible error, where (1) the defendant's objection was interposed only after the officer gave this testimony, and (2) the jury heard no evidence as to the nature or results of the test.

6. Criminal Law § 66— in-court identification of defendant — witness' meeting with defendant in the police station

A witness' in-court identification of the defendant was not tainted by the fact that the witness had seen the defendant in the hallway of

the police station at a time when defendant was without counsel and did not know he was under observation, where the witness had had ample opportunity to observe the defendant on the night of the crime and based his identification on the events of that night.

APPEAL by defendant from *Crissman, J.*, at the 24 August 1970 Session of FORSYTH, heard prior to determination by the Court of Appeals.

By an indictment, proper in form, the defendant was charged with assault with intent to commit rape. He was found guilty and was sentenced to imprisonment for a term of fifteen years. The evidence for the State was to the following effect:

The victim of the assault, a sixteen year old student at R. J. Reynolds High School in Winston-Salem, attended the Junior-Senior Prom at the school gymnasium on the evening of 24 April 1970, accompanied by her escort, also a sixteen-year-old senior student in the high school. At about midnight, they walked out of the gymnasium and strolled over the surrounding grounds, including the baseball field and tennis courts. The area was not lighted artificially but the moon was shining.

As they approached a building on the school grounds containing rest rooms, the defendant stepped out in front of them and blocked their path. When they tried to go around him, he again blocked their way and, thereupon, four other young Negro men joined him, surrounding the girl and her escort. He then felt a knife at his back and one of the men put his arm on the boy's shoulder so that the boy could see a knife in his hand.

The defendant and his companions compelled the girl and her escort to go to a point on the school grounds where there was less light. There they forcibly separated the escort from the girl, pulling him some distance away and pushing him to the ground, one of his guards having a knife. In that position the girl's escort heard slaps and screams from the area where she had been held by the other three Negroes. One of the boy's guards subsequently exchanged places with one of the three who had originally remained with the girl. The boy finally escaped from his guards, being struck in the face with a hand and with the handle of a knife in the process. Running to the area where he had last seen the girl, he did not find her but found her clothing, with which he ran to the gymnasium and told the principal and another teacher what had occurred. They

State v. Williams

returned with him in search of the girl whom they located in a patch of bushes, she being completely nude and having been severely beaten.

After being separated from her escort, the girl was restrained forcibly by the defendant and two of the other men. All three of them began taking liberties with her person. When she begged them to desist, they all began slapping her and jerking her back and forth between them. They threw her to the ground and disrobed her completely, she fighting them at all times. The defendant then sat upon her chest, strangling her with one hand and beating her with the other, and told her he would kill her if she did not stop screaming. While he so sat upon her one of the other two men attempted to have intercourse with her but was unsuccessful due to her resistance, this man striking her repeatedly with his fist.

The defendant then exchanged places with one of the other two men and, thereupon, another person, either the defendant or the third man, attempted to have intercourse with the girl forcibly, but was unsuccessful due to her resistance. Suddenly they all jumped up and ran away, whereupon she fled into the patch of bushes and collapsed.

The girl was carried to the hospital immediately and treated there for a dislocated jaw, a broken cheek bone, an injury to the nerves of her eye and various cuts and bruises over her face and body. At the time of the trial of this defendant, she still had no feeling in her right cheek and the nerves in her eye had not returned to their normal condition.

Both the girl and her escort positively identified the defendant in the courtroom, the girl testifying that in the area where the attack occurred there was enough light to enable one to see people around one, that she would never forget the face of this defendant as he sat upon her, right in front of her, and beat her. Both the girl and her escort identified the defendant as the first of the men to stop them, and the escort identified the defendant as one of the men who separated him from the girl, forcing the escort to the place where he was detained by his guards and then returning to the place where the other men were holding the girl.

Upon cross-examination, the girl's escort testified that he described the defendant to the police on the night of the assault

and saw the defendant again a week later, this time at the police station. He then recognized the defendant as the assailant who had first stopped him and the girl on the night of the attack. When he saw the defendant at the police station the defendant was walking about in the hallway with a police officer. The witness was asked by the officers on that occasion to look at some other men on the same floor of the police station, which he did, but was not able to identify any of them as being among the assailants. He again saw the defendant at the latter's preliminary hearing. At some time during the week following the assault, the girl's escort was shown photographs of fifteen people from which he picked the photograph of the defendant and of one other as being members of the group of five who committed the assault. The inspection of the photographs occurred after the boy had seen and recognized the defendant at the police station. On that occasion he told the officers that the defendant resembled "very much" one of the men who had attacked him and the girl and that he would "like to study him some more."

On cross-examination, the girl testified that while she was in the hospital she was shown a group of fifteen photographs from which she picked a photograph of the defendant as one of her assailants, her selection of the photographs being by reason of her recognition of his face as she remembered seeing it on the night of the assault. Her recognition was not based upon any particular feature but upon her recollection of his face in its entirety.

Detective Sergeant Linville and Detective Benbow of the City Police Force also testified for the State. Sergeant Linville testified that he talked to the defendant, first identifying himself to the defendant and advising the defendant what it was he wished to talk to him about. He advised the defendant of each of his constitutional rights set forth in the usual Miranda warning. The defendant stated that he understood these rights and thereupon the defendant signed a written waiver of counsel and a statement that he was willing to answer questions and to make a statement, this written waiver being introduced into evidence at the trial.

Detective Benbow testified that the defendant came to the police station four days after the assault as the result of Benbow's visit to his home and request to his mother that she tell

State v. Williams

the defendant he wanted to talk to him. Upon arrival at the police station, the defendant first talked to Sergeant Linville, as above stated. After Sergeant Linville had advised the defendant concerning his rights, he turned the defendant over to Detective Benbow for interrogation. Detective Benbow then again advised the defendant of his rights, as declared in the Miranda decision, and informed the defendant as to the matter about which he wished to talk to the defendant. The defendant then again signed a form waiving his right to counsel and consenting to talk to the officer. The defendant also consented to the taking of his photograph for the purpose of exhibiting it to the victims of the assault and to the taking of a polygraph test. The defendant was not then under arrest.

After some questioning by Detective Benbow, the defendant stated that, before going any further, he wished to talk to a lawyer. Detective Benbow then asked him what lawyer he would like and offered to assist the defendant in getting a lawyer, giving him a telephone directory. Before anything else occurred, the defendant decided that he wanted to talk to his parents rather than to a lawyer. Thereupon, the defendant's mother and father were brought to the police station and were told by Detective Benbow what was the nature of the discussion and were taken by him into the room where the defendant was and were left alone with the defendant for five or ten minutes.

Upon Detective Benbow's return to the room, the defendant's parents advised him to tell the truth. Thereupon, the defendant made an oral statement of which Detective Benbow took notes. A typewritten statement, prepared from these notes, was handed to the defendant and was read and signed by him, he having been placed under arrest after making his oral statement and during the interval while the written statement was being typed. The defendant's father and mother, Detective Benbow and Lieutenant Revis of the City Police Force were present when the statement was made by the defendant.

In the statement of the defendant, which was introduced in evidence, the defendant identified his four companions, recited that the five of them went to the tennis courts on the the night in question and waited until "a white male and white female came walking down, and we got them at the brick house at the tennis courts." The statement further recited that one of the five had a knife, the defendant "walked beside the boy,"

two others were behind them and two were beside the girl. The defendant and another separated the boy from the girl and, thereafter, the defendant went back to where the girl was being kept by his companions, after which the defendant "held both of the girl's arms" while two of his companions "took the girl's clothes off" and one of them "was trying to mess with her and she got loose and fought him off." The defendant "hit her once." Thinking someone was coming, they all ran away.

Before either of the police officers testified, an extensive voir dire hearing was conducted in the absence of the jury. Both officers were examined on voir dire. The defendant did not testify on voir dire or offer any evidence thereon. On voir dire, Sergeant Linville testified in detail as to the explanation of the defendant's rights given by him to the defendant, this being the complete and customary Miranda warning. The defendant stated that he understood these, and Sergeant Linville then read to the defendant a waiver form which the defendant signed, this being the form above mentioned. The defendant was advised by Sergeant Linville as to the nature of the occurrence about which the officers wished to talk to him.

Officer Benbow testified on the voir dire examination in accordance with his testimony, subsequently given in the presence of the jury as above related, including his repetition of the full Miranda warning, the conference between the defendant and his parents and the making thereafter of the statement by the defendant.

At the conclusion of the voir dire examination, the court made full findings of fact, in accordance with the testimony of the officers, and concluded thereupon that the statement by the defendant and his waiver of his rights were competent to be introduced into evidence. The defendant's motion to suppress the evidence of the statement by the defendant was denied.

The defendant offered no evidence either upon voir dire or before the jury.

*Attorney General Robert Morgan and Assistant Attorney General Thomas B. Wood for the State.*

*H. Glenn Davis for defendant.*

LAKE, Justice.

[1]  The defendant assigns as error a portion of the court's final instruction to the jury, asserting that therein the court expressed an opinion as to the facts of the case in violation of G.S. 1-180. Earlier in the charge, the court stated correctly the elements of the crime of assault with intent to commit rape and those of the lesser included offense, assault on a female, and reviewed the evidence. In the portion in question, the court restated, correctly, what the jury must find from the evidence, beyond a reasonable doubt, in order to convict the defendant of the respective offenses and stated the contentions of the State and of the defendant as to what verdict the jury should render. Immediately thereafter, the court instructed the jury that if they were not so satisfied from the evidence, beyond a reasonable doubt, they would return a verdict of not guilty, the burden being upon the State to so satisfy them.

[1, 2]  Quite obviously, the court expressed no opinion as to the sufficiency of the evidence to prove any fact, or as to the verdict which the jury should return. The defendant does not specify wherein the instructions to which he excepts stated any opinion of the court. We are unable to see any misstatement by the court, either of the law applicable to the offenses in question or of any contention of the defendant. It is well settled that any misstatement of the contentions of the parties must be called to the attention of the court at the time, so as to permit a correction, or such misstatement will be deemed waived. *State v. Britt,* 225 N.C. 364, 34 S.E. 2d 408; *State v. Smith,* 225 N.C. 78, 33 S.E. 2d 472. There is no merit in this assignment of error.

[3]  The defendant next contends that the sentence imposed was cruel and unusual. It is the maximum sentence authorized by G.S. 14-22 for the offense of which the defendant has been convicted. This Court has repeatedly held that a sentence which does not exceed the maximum authorized by the statute cannot be deemed cruel and unusual. *State v. Bruce,* 268 N.C. 174, 150 S.E. 2d 216, and cases there cited. This assignment of error is also without merit.

[4]  After the defendant had been fully advised of his constitutional rights and of the nature of the matter concerning which the police officers wished to interrogate him, he waived in writing his right to counsel and stated his willingness to answer

questions. After answering a number of questions by the interrogating officer, the defendant said, "Before I go any further I want to talk to a lawyer." The officer immediately offered to assist him in procuring any lawyer he wished to have. The defendant then said he wanted his parents present instead of a lawyer.

There is nothing in the record to indicate that any further question was propounded to him, or that any statement was made by him, until after both of his parents had arrived at the police station and conferred privately with the defendant. Upon the return of the officer to the interrogation room, the parents advised the defendant to tell the officer the truth about the matter. There was no further suggestion that he or his parents desired the presence of a lawyer prior to resumption of the interrogation. The officer testified to these facts on the voir dire examination. Neither the defendant nor his parents testified.

In *Miranda v. Arizona,* 384 U.S. 436, 473-475, 86 S.Ct. 1602, 16 L. Ed. 2d 694, 723-724, the Supreme Court of the United States said concerning custodial interrogation:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. * * *

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

In *State v. Fox,* 274 N.C. 277, 295, 163 S.E. 2d 492, this Court said upon that subject:

"If Roy [Fox] voluntarily made the statement (S-42), or the earlier one which was not transcribed, and *thereafter*

State v. Williams

requested counsel for the first time, he was not deprived of his Sixth Amendment right to counsel. If, however, *after* he had requested an attorney, and *before* he was given an opportunity to confer with him, officers continued to interrogate Roy, any incriminating statement thus elicited cannot be received in evidence against him."

In the present case, the defendant was not placed under arrest until after he confessed orally to his participation in the offense of which he has been convicted. He came to the police station voluntarily in response to a request from the police officer, which request was relayed to him by his mother. After he stated a desire for counsel, the officer stopped interrogating him with reference to his activities and his connection with the offense under investigation, inquiring only as to which attorney the defendant desired to consult, offering assistance in getting the attorney of the defendant's choice to come to the station. Without anything further, the defendant informed the officer that he had changed his mind and wanted to confer with his parents instead of an attorney. Nothing in the record indicates any further interrogation by the officer of statement by the defendant until after the arrival of his parents and his conference with them. Both parents were present throughout the remaining interrogation.

Under these circumstances, we find nothing in *Miranda v. Arizona, supra, State v. Fox, supra,* or in G.S. 7A, Art. 36, which precludes the police officer from relying upon the previously written waiver of counsel, resuming the interrogation and taking the defendant's statement voluntarily made. Insofar as any right to counsel is conferred upon an indigent person by G.S. 7A, Art. 36, in addition to his constitutional right, it is to be observed that G.S. 7A-451(b) provides that such right "*begins* * * * *after* the indigent is taken into custody or service is made upon him of the charge, petition, notice or other initiating process." (Emphasis added.)

The undisputed evidence on the voir dire examination fully supports the findings by the trial court to the effect that the defendant voluntarily went to the police station, waived in writing his right to counsel and his right to remain silent, voluntarily, with full understanding of his rights and while not under arrest, made, in the presence of his parents, the oral confession, which was subsequently reduced to writing, and

voluntarily signed the written statement of it. Under these circumstances, there was no error in the admission in evidence of either the written confession or the written waiver. The defendant's Assignments of Error 2, 4, 9 and 10 are overruled.

[5] Without objection, Officer Benbow testified that while the defendant was not under arrest he agreed to take a polygraph test. Thereupon, the defendant objected "to any reference to *the* polygraph test." (Emphasis added.) The court overruled this objection. Thereupon, the solicitor asked the witness if a polygraph test was administered and the witness replied affirmatively. The defendant interposed an objection after the answer was given. The well settled general rule is that objections, interposed after the witness has testified, come too late to form the basis for the award of a new trial. Stansbury, North Carolina Evidence, 2d Ed., § 27; Strong, North Carolina Index, 2d Ed., Trial, § 15. There was no evidence, before the jury, as to the nature of the test, the questions propounded, the answers given, or the result of the test. Upon the voir dire examination of Officer Benbow, in the absence of the jury, and at no other stage of the trial, it was developed upon cross-examination that after the test was given, the defendant was informed that the test showed that he was not telling the truth about the matter. The voir dire examination makes it abundantly clear that the defendant consented to take the test after he signed the written waiver of counsel and of his right to remain silent. There is no merit in this assignment of error.

[6] The defendant further contends that the in-court identification of the defendant by the girl's escort was tainted by this witness having previously observed the defendant walking in the hallway of the police station in the presence of a police officer, at which time the defendant was without counsel. The record clearly indicates that this observation of the defendant by the witness occurred on the day of the defendant's interrogation by the police officers above discussed, that the witness was then at the police station in response to an invitation from the police and that his observation of the defendant occurred after the defendant had waived counsel and prior to his arrest. It does not appear that the defendant was then aware that he was being observed, or was to be observed, by a potential witness against him or that he consented to such observation. There was no lineup and there is no indication that any other Negro male was in the hallway at the time. At trial, the witness testi-

fied that on the occasion of this observation of the defendant, he informed the officers that the defendant resembled one of the participants in the offense "very much" and the witness "would like to study him some more."

The State offered no evidence of this out-of-court observation of the defendant by the witness. All of the foregoing facts concerning it were developed by the defendant on cross-examination of this witness. He did not request a voir dire examination in the absence of the jury with reference to this matter. The defendant, having introduced the evidence through cross-examination, cannot and does not assign its admission as error. His contention is that these facts, so developed by him, made the in-court identification by this witness incompetent and, consequently, the court erred in overruling his motion to strike the testimony concerning such in-court identification. He relies upon *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed. 2d 1149, and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed. 2d 1178. These cases do not support his contention.

In the Wade case, *supra*, the Supreme Court of the United States said:

> "Where, as here, the admissibility of evidence of the lineup identification itself is not involved, a *per se* rule of exclusion of courtroom identification would be unjustified. * * *

> "We think it follows that the proper test to be applied in these situations is that quoted in *Wong Sun v. United States*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S.Ct. 407, ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt 221 (1959).' * * * Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person,

the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. * * *

"On the record now before us we cannot make the determination whether the in-court identifications had an independent origin. * * * We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error, *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S.Ct. 824, and for the District Court to reinstate the conviction or order a new trial, as may be proper."

It is abundantly clear, upon this record, that this witness had ample opportunity to observe this defendant on a clear moonlight night when the defendant twice stepped immediately in front of him and blocked his passage and then twice forcibly separated the witness from the girl he was escorting, during which time he talked to the witness and demanded that the witness give him and his companions a ride to the airport. The witness' in-court identification of this defendant was positive. Obviously, it had an origin independent of and prior to his observation of the defendant at the police station.

The defendant does not question the competency of the positive, unequivocal, in-court identification of the defendant by the girl, who testified that the defendant sat upon her chest, strangling her with one hand and beating her with the other while his companion was attempting to rape her.

The defendant's Assignments of Error 3, 6 and 7, relating to the in-court identification of the defendant by the girl's escort, are without merit.

No error.