STATE OF NORTH CAROLINA v. TONY GRAY KIRKMAN AND RONNIE LEE HAWKS

No. 13

(Filed 11 November 1977)

1. **Jury § 7.14— peremptory challenge of juror after impanelment**
      Where, after the jury in a homicide case, including two alternates, had been selected and impaneled, a juror reported to the court that she had observed a communication between a lady with whom she worked and counsel for one of the defendants and believed it possible that this lady was a relative of such defendant, and upon inquiry by the court it developed that the lady who had so communicated with the attorney was one defendant's wife, the trial court did not abuse its discretion when it permitted the district attorney to recall the juror for further examination, allowed the district attorney's peremptory challenge of the juror, and seated one of the alternate jurors in place of the juror so excused.

2. **Criminal Law § 73.2— instruction to witness to tell the truth—no hearsay**
      Testimony that the district attorney and investigating police officers had told the witnesses "to tell the whole truth and nothing but the truth" was not hearsay.

3. **Criminal Law § 73.2— showing that statement was made—no hearsay**
      In this prosecution for murder committed in the perpetration of a robbery, testimony that the victim said "that he had plenty of money on him" and he tried to talk one defendant's girl friend into leaving with him was not hearsay since the purpose of the evidence was not to prove that the victim did, in fact, have money on his person but was to show that the statement was made in the presence of defendant's girl friend.

**4. Criminal Law § 73.3— statements showing motive—no hearsay**

In this prosecution for murder committed in the perpetration of a robbery, testimony that the witness overheard one defendant's girl friend tell such defendant about what money the victim had on him was not hearsay, whatever may have been the source of the girl friend's information, since the purpose of the testimony was not to prove the correctness of the girl friend's statement to defendant as to what money the victim had on his person but was to establish that the statement was, in fact, made to such defendant, thus providing a motive for the killing of the victim.

**5. Criminal Law § 89.3— corroboration—prior joint statement by two witnesses —inability to separate statements by each witness**

The trial court in a homicide case did not err in refusing to strike an officer's testimony, admitted for corroborative purposes, as to a joint statement made to him by two State's witnesses on the ground that the officer was not able to state specifically which statements made at the joint interview were made by each witness, since there was no suggestion in the officer's testimony that any statement made by either witness was contradicted by the other.

**6. Criminal Law § 89.5— admission of noncorroborative testimony—harmless error**

Defendants were not prejudiced by the trial court's failure to instruct the jury to disregard an officer's noncorroborative testimony that a witness told him that the first defendant "made a nodding motion" to the second defendant before the second defendant shot the victim, since the testimony concerned an immaterial detail, and the discrepancy was of no consequence in view of testimony that after the second defendant shot the victim three times, the first defendant directed him to shoot the victim again because he was still moving.

**7. Criminal Law § 62— references to lie detector tests**

Defendants were not prejudiced when a witness referred to the fact that she had taken a lie detector test, a second witness stated she had been asked by officers to take a lie detector test, and an officer testified that he had asked the second witness to take a lie detector test, since there was no testimony as to the result of any polygraph test or as to the particular statement of the witness to which any such test related.

**8. Homicide § 21.6— murder in perpetration of robbery—sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution of two defendants for first degree murder committed during the perpetration of a robbery where it tended to show that a female occupant of a trailer saw several hundred dollar bills in the victim's wallet; when one defendant came to the trailer a short time later, he and the female occupant had a private conversation, following which both left the trailer; in about 20 minutes both defendants entered the trailer and, without any conversation except normal salutations, the second defendant shot the victim three times and then, at the

direction of the first defendant, shot him again; and the second defendant then removed from the victim's pocket his wallet, pistol and keys.

**9. Robbery § 4— variance—amount of money taken**

There was no fatal variance between indictment and proof in an armed robbery case where the indictment charged that defendants did take, steal and carry away "approximately $400.00 in United States currency" from the victim's person and the evidence showed that the victim had several hundred dollars in his wallet and defendants took the victim's wallet, it not being necessary that the State prove the taking of the exact amount of money alleged in the indictment.

**10. Constitutional Law § 33; Homicide § 31.1— life imprisonment for first degree murder—ex post facto laws**

A construction of Ch. 1201, Session Laws of 1973 as making life imprisonment the proper sentence for a first degree murder committed prior to the decision of the U.S. Supreme Court invalidating the death penalty in this State for first degree murder, *Woodson v. North Carolina*, 428 U.S. 280, does not violate the *ex post facto* clause of the State and Federal Constitutions.

APPEAL by defendants from *Walker, J.,* at the 8 November 1976 Special Session of SURRY.

Upon indictments, proper in form, each defendant was found guilty of armed robbery and of first degree murder in the perpetration of a felony. Each was sentenced to imprisonment for life upon the murder charge and, as to each defendant, judgment was arrested upon the charge of armed robbery, this being the felony in the perpetration of which the murder was committed.

The evidence introduced by the State, if true, was sufficient to show:

On 26 March 1976, the body of Clayton Gravely, a resident of Carroll County, Virginia, was found in the trunk of his automobile, which was abandoned in a peach orchard in Carroll County, a short distance north of the North Carolina State line. The body was partially wrapped in a sheet and a quilt which were identified as having come from the trailer home of Betty Ramey, then located in Surry County, North Carolina. The trailer was destroyed by an intentionally set fire in the early night hours of 26 March, approximately seven hours after the body of Gravely was found in the trunk of the car. There were four bullet wounds in the body, the cause of death being either a wound in the chest or a wound in the back, either of which would have been fatal. Neither the body nor the clothing thereon showed powder

residue, indicating that the shots were fired from a distance of at least two feet.

On 24 March, Dreama Smith, half-sister to Betty Ramey, was also living in the trailer. Living there with Dreama Smith was Jackie Easter. Betty Ramey was a drug addict. She is presently serving a prison sentence for breaking and entering. On that date no one was "living with" Betty Ramey, her most recent cohabitant having moved out of the trailer when Easter moved in.

On 24 March, Clayton Gravely came to the trailer to see Betty Ramey, as he and other men frequently did. She was not at home so he left and returned in the afternoon. At that time, Betty Ramey, Dreama Smith, Easter and two other women were present in the trailer. After about an hour of conversation, the other two women left. Gravely remarked that he had "plenty of money on him" and tried to persuade Betty Ramey to go to South Carolina with him but she refused. He was then carrying an automatic pistol. Betty Ramey saw that he had "several hundred dollar bills in his billfold."

The defendant Kirkman, who had been "going with" Betty Ramey for two or three weeks, then arrived at the trailer. He and Betty Ramey went into one of the back rooms and engaged in a conversation for a few minutes, immediately following which they departed in his car. In about 20 minutes he returned with the defendant Ronnie Hawks, Betty Ramey not being with them. At that time, Gravely and Easter were alone in the living room of the trailer, Dreama Smith having gone to sleep in one of the bedrooms.

Easter testified: When the two defendants walked into the trailer, the four men simply spoke to each other. The defendants did not sit down and Gravely and Easter stood up simply by way of greeting the new arrivals. Kirkman walked across to the far end of the living room and leaned against a post, Hawks remaining in front of the door. Two or three minutes after their arrival, Hawks "pulled around with a gun in his hand" and shot Gravely, then standing two or three feet from Hawks. Three shots were fired and Gravely fell to the floor. Kirkman then said, "He is still moving, shoot again." Hawks shot Gravely again and said, "He ain't moving any more." Hawks then removed from Gravely's pocket his wallet, gun and keys.

Pursuant to instructions from the defendants, Easter obtained a sheet from a bed in the trailer, and this, together with a quilt taken from the couch in the living room, were put over Gravely's body. The defendants told Easter that if he was "planning on talking" and couldn't keep his mouth shut, he might as well lie down beside Gravely. The defendants then instructed Easter to open the trunk of Gravely's car, which he did with the keys given him by Hawks. The defendants brought Gravely's body out of the trailer and put it in the trunk of the car. They then instructed Easter to follow them in Hawks' car, in which the two defendants had come to the trailer. This he did, the two defendants riding in Gravely's car, in the trunk of which they had placed the body. They drove to the orchard where the Gravely car and Gravely's body were eventually found, left the car there and, the defendants coming back to the car driven by Easter, they all returned to the trailer of Betty Ramey.

After arriving at the trailer, the defendants told Easter and Dreama Smith to clean it up, a substantial quantity of blood having gotten upon the floor. The defendants then departed and Easter and Dreama Smith cleaned up the blood as best they could. Before departing, the defendant Kirkman told Easter and Dreama Smith that if they knew what was good for them they would forget all they had seen. An hour later, Kirkman brought Betty Ramey back to the trailer, this time traveling in his own car.

Betty Ramey testified: Kirkman had picked her up at the trailer in which Hawks and his wife were then living, to which he had taken her when he and she left her trailer prior to the shooting. After Kirkman and Betty Ramey left the Hawks trailer, they rode about and, as they crossed the Ararat River, he directed her to throw into the river a package which contained an object which "felt like it was a gun." This she did.

Easter and Dreama Smith testified: Following the burning of the Ramey trailer, Kirkman arranged lodging for Dreama Smith and Easter at a motel, where they stayed for two or three weeks, Kirkman paying the bill. They then left the county and went to live with Dreama Smith's mother in Reidsville. When interviewed by officers investigating both the burning of the trailer and the death of Gravely, they first denied knowledge of the killing of

Gravely because they were afraid, but eventually they told the officers what they had seen and heard at the Ramey trailer.

On 26 March, the day the body was found and the trailer was burned, a 1969 Oldsmobile was added as a covered vehicle to Kirkman's insurance policy.

Each defendant testified in his own behalf and denied any connection whatever with the shooting or robbery of Gravely. Kirkman testified that he did not know Gravely, did not kill him, did not witness the killing of Gravely by Hawks and did not go to the trailer of Betty Ramey on the date of Gravely's death. He acknowledged that he bought the 1969 Oldsmobile on the day the body of Gravely was discovered and the Ramey trailer was burned. Defendant Hawks denied that he had ever been at the trailer of Betty Ramey. Both defendants admitted, on cross-examination, their previous convictions for larceny.

Other evidence is set forth in the opinion in connection with the respective assignments of error to which it relates.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Fred Folger, Jr., and Larry Bowman for Defendant Kirkman.*

*Bruce C. Fraser for Defendant Hawks.*

LAKE, Justice.

[1] After the jury, including two alternates, had been selected and impaneled, the court recessed for the day. Before anything else was done the following day, one of the twelve jurors brought to the attention of the court the fact that she had observed a communication between a lady with whom she worked and counsel for one of the defendants and believed it possible that this lady was a relative of such defendant, of which fact the juror had not previously been aware. Upon inquiry by the court, it developed that the lady who had so communicated with the attorney was the wife of the defendant Hawks. There was no suggestion of any impropriety in the conduct of Mrs. Hawks or of any communication between her and the juror. In response to questions by the court, the juror stated that she would feel no embarrassment in serving on the jury and returning a verdict against the defendant Hawks, if the evidence so warranted, and then continuing to work

with Mrs. Hawks. The District Attorney then asked the juror a few questions with reference to the extent and duration of her acquaintance with Mrs. Hawks.

The remaining jurors were then brought back into the courtroom and the court inquired if the State was ready to proceed. Thereupon, the District Attorney requested a conference with the court in the absence of the jury and the jury was again sent from the courtroom. The District Attorney then advised the court that had he known of the above circumstances he would have excused the juror. He requested leave to reopen the examination with reference to this particular juror. In its discretion, the court permitted this and called the juror back for further examination. Without further questioning, the District Attorney "in the interest of time" exercised one of his remaining three peremptory challenges, and the court, in its discretion, allowed the challenge over the objection of the defendants, seating one of the alternate jurors in place of the juror so excused. The jury was then reimpaneled. The defendants moved for a mistrial, which motion was denied. Neither defendant had exhausted his peremptory challenges and neither defendant requested permission to make any further examination of the alternate juror so seated as one of the twelve. The trial then proceeded.

In this we find no reversible error. The purpose of selecting alternate jurors is to permit a trial to proceed although one of the impaneled twelve becomes ill or otherwise unable to serve. Neither defendant suggests that any of the jurors who actually served was incompetent to do so or objectionable to such defendant. It is well established that, prior to the impaneling of the jury, it is within the discretion of the trial judge to reopen the examination of a juror, previously passed by both the State and the defendant, and to excuse such juror upon challenge, either peremptory or for cause. *State v. Bowden*, 290 N.C. 702, 228 S.E. 2d 414 (1976); *State v. Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976); *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, death sentence vacated, 429 U.S. 912 (1976); *State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796, *cert. den.*, 414 U.S. 850 (1973).

In the foregoing cases, we held that G.S. 9-21(b) providing that the State's challenge, whether peremptory or for cause, must be made before the juror is tendered to the defendant "does not deprive the trial judge of his power to closely regulate and super-

vise the selection of the jury to the end that both the defendant and the State may receive a fair trial before an impartial jury." *State v. McKenna, supra,* at 679. In all the foregoing cases, the challenge in question was allowed before the jury was impaneled. We perceive no reason for the termination of this discretion in the trial judge at the impanelment of the jury. This assignment of error is overruled.

[2] Assignments of Error 6, 7 and 8 are based upon alleged violations of the Hearsay Rule in the admission of the State's evidence. Over objection, witnesses for the State were permitted to testify that the District Attorney and investigating police officers had told the witnesses "to tell the whole truth and nothing but the truth." Obviously, testimony that such an instruction was given to the witness who is testifying thereto is not hearsay.

[3] Dreama Smith testified, without objection, that it was she, Easter, Betty Ramey and Clayton Gravely who were talking in the trailer prior to the first arrival of the defendant Kirkman. She saw that Gravely had a gun and he told them that he had it to protect himself. To a question by the District Attorney as to what Gravely said about money, the defendants objected. The objection was overruled and Dreama Smith answered, "He said that he had plenty of money on him and he tried to talk Betty into leaving with him." This was not hearsay. The purpose of this evidence was not to prove that Gravely did, in fact, have money on his person but was to show that the statement was made in Betty Ramey's presence.

[4] Dreama Smith then continued to testify, without objection, that upon the arrival of Kirkman at the trailer he and Betty Ramey went into another room and had a conversation, immediately following which he and Betty Ramey left the trailer. Over objection, Dreama Smith was then permitted to testify that she heard Betty Ramey tell Kirkman, in this conversation, "about what money Clayton [Gravely] had on him." Subsequently, when called as a witness, Betty Ramey denied making such a statement to Kirkman, but she further testified that she, Betty Ramey, saw "several hundred dollar bills in his [Gravely's] billfold." While Dreama Smith was still testifying, the court recessed for the day. At the start of the next day's session, the court instructed the jury that he was reversing his ruling of the previous day, was allowing the objections of the two defendants to the testimony of

Dreama Smith concerning what she had heard Betty Ramey say to the defendant Kirkman about what money Gravely had on him and was directing the jury not to consider such testimony by Dreama Smith. The defendant contends that it was impossible for the court by this instruction to remedy its alleged error in initially admitting the evidence and, therefore, a new trial should be granted.

The fallacy of this contention is that the error of the court was not in admitting the evidence but in instructing the jury to disregard it, which error was, of course, not prejudicial to the defendants. This testimony of Dreama Smith as to the statement she heard Betty Ramey make to the defendant Kirkman, whatever may have been the source of Betty Ramey's information, was not hearsay evidence. The purpose of Dreama Smith's testimony on this point was not to prove the correctness of the statement of Betty Ramey to Kirkman as to what money Gravley had on his person. The purpose of the evidence was simply to establish that the statement was, in fact, made to Kirkman, thus planting in his mind the belief that Gravely had money on his person and thus providing a motive for the killing of Gravely.

The evidence of the State is that, immediately following this conversation in the back bedroom of the trailer between Betty Ramey and Kirkman, the two of them left the trailer, Kirkman returning in approximately 20 minutes with Hawks, and the shooting of Gravely occurring in two or three minutes after the two men entered the trailer and before anything occurred other than simple salutations.

The Hearsay Rule does not preclude a witness from testifying as to a statement made by another person when the purpose of the evidence is not to show the truth of such statement but merely to show that the statement was, in fact, made. *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975); *State v. Crump*, 277 N.C. 573, 178 S.E. 2d 366 (1971); *State v. Griffis*, 25 N.C. 504 (1843); Stansbury, North Carolina Evidence (Brandis Rev., 1973), § 141.

These assignments of error are overruled.

David Beal, an agent of the State Bureau of Investigation, testified that he interviewed Easter and Dreama Smith, jointly, on two occasions and observed and listened to a third interview

with these witnesses conducted by other officers. Over objection, he was permitted to testify as to statements made by them. Repeatedly, throughout his testimony, the judge instructed the jury that this testimony was not substantive evidence but was admitted solely for the purpose of corroborating Easter and Dreama Smith, if the jury found that it did so corroborate them. Beal testified that in their first statement Easter and Dreama Smith told him they were both in the bedroom of the trailer at the time Gravely was killed and so did not actually witness the shooting, but on the second interview, Easter told him that he (Easter) had not told the truth in the first statement, that he was present in the trailer and actually witnessed the killing of Gravely and that Hawks had pulled out a pistol and shot Gravely, Kirkman being present in the trailer at the time. Beal testified that Dreama Smith told him she was actually in the bedroom at the time the killing occurred and did not witness it.

The defendant Kirkman objected to the testimony by Beal concerning the first statement made to him by Easter, for the reason that this did not corroborate Easter's own testimony. Easter's own testimony with reference to this matter was that he first talked to Agent Beal and Captain Scott of the Surry County Sheriff's Department and told them nothing but that eventually he told them what had happened, his failure to tell them what he knew about the matter at the first interview being due to his being scared. Thus, the testimony of Agent Beal corroborates the testimony of Easter to the effect that the latter made inconsistent statements to the officers at the different interviews. Furthermore, while the first statement of Easter to the officers did not corroborate his testimony as to his own whereabouts at the time of the shooting, we fail to see how this first statement, that he was not then present in the living room when the shooting occurred, could possibly have been prejudicial to the defendant Kirkman. In other respects, the testimony of Agent Beal concerning statements made to him by Easter and Dreama Smith does tend to corroborate their testimony at the trial.

[5]   Both defendants moved to strike the testimony of Agent Beal concerning their joint statement to him, for the further reason that Agent Beal was not able to state specifically which statements, made at the interview, were made by Easter and which were made by Dreama Smith. The testimony of Agent Beal makes

it clear that Easter and Dreama Smith were interviewed by him at the same time. There is no suggestion in his testimony that any statement made by either of them was contradicted by the other. At the trial, both Easter and Dreama Smith testified that she was in the bedroom at the time of the shooting and did not see it.

[6] Captain Scott testified that he was present with Agent Beal when Easter and Dreama Smith made a statement concerning the killing of Gravely. The court twice instructed the jury, during the testimony of Captain Scott, that his testimony was admitted solely to corroborate the testimony of Dreama Smith or Jackie Easter and that it was for the jury to determine whether it did so corroborate those witnesses, his testimony not being substantive evidence. Captain Scott then testified that Easter's statement was that Easter was in the mobile home on the day that Gravely was shot, that Dreama Smith was in the bedroom asleep, that Kirkman and Hawks came into the trailer, that Kirkman walked over to the divider between the kitchen and the living room, leaned up against the post and looked over toward Hawks who was standing near the doorway and "made a nodding motion." Easter's own testimony did not mention a "nodding motion" made by Kirkman. Thus, to this extent, Captain Scott's testimony concerning Easter's statement in his presence did not corroborate Easter's own testimony. This, however, was an immaterial detail in the light of the entire statement to Captain Scott by Easter which otherwise fully corroborated Easter's testimony concerning the circumstances of the shooting and the disposition of the body. In view of Easter's testimony, so corroborated by the testimony of Captain Scott, that after Hawks shot Gravely three times, Kirkman directed Hawks to shoot Gravely again since he was still moving, the above mentioned discrepancy is of no consequence and the court's failure to instruct the jury to disregard Captain Scott's testimony concerning the making of a "nodding motion" was harmless error.

*State v. Bagley*, 229 N.C. 723, 51 S.E. 2d 298 (1949), relied upon by the defendants, is distinguishable in that in the *Bagley* case a prior statement of the witness to the investigating officer substantially and prejudicially expanded her testimony concerning what she had seen and heard at the time of the shooting there in question.

In *State v. Patterson*, 288 N.C. 553, 572, 220 S.E. 2d 600 (1975), death sentence vacated, 428 U.S. 904 (1976), speaking through Justice Moore, this Court said: "If the previous statements offered in corroboration are generally consistent with the witness' testimony, slight variations between them will not render the statements inadmissible. Such variations affect only the credibility of the evidence which is always for the jury." In *State v. Caddell, supra,* at 278, we said, "To be admissible for corroborative purposes it is not necessary that the prior statement of a witness be in the exact words of her testimony at the trial, it being sufficient that the two are consistent." *See also: State v. Britt*, 291 N.C. 528, 231 S.E. 2d 644 (1977); *State v. Warren*, 289 N.C. 551, 223 S.E. 2d 317 (1976); *State v. Tinsley*, 283 N.C. 564, 196 S.E. 2d 746 (1973); *State v. Westbrook*, 279 N.C. 18, 35, 181 S.E. 2d 572 (1971), death sentence vacated on other grounds, 408 U.S. 939 (1972).

We find no merit in this assignment of error.

[7] During the cross-examination of Dreama Smith by Kirkman's counsel, the witness was testifying concerning the first time she decided that she was "safe and far enough away to tell an officer anything about" this matter. In the course of that portion of her testimony, and apparently not in response to a question by defendant's counsel, she said: "I don't remember the dates that I went to Mr. Scott's office in Wentworth and made the statement to him. It was about a week after I took a lie detector test." Counsel at that time did not request any instruction or ruling with reference to this statement concerning such test.

Subsequently, when Betty Ramey was testifying she stated that she had been questioned by two Virginia officers with reference to the burning of her trailer and stated that these officers asked her if she would take "a lie detector test." Upon objection by counsel for both defendants, the court struck that statement and told the jury not to consider it.

Thereafter, Detective Andrews of the Virginia State Police testified that he had an interview with Betty Ramey concerning the death of Gravely, which at that time he believed to have been a homicide committed in the State of Virginia, and that, at the conclusion of the interview, he asked Betty Ramey if she would accompany him to Wytheville, Virginia, and take a polygraph test.

Counsel for Kirkman objected and the court overruled the objection, saying to counsel: "No, don't go any further. It has been brought out, don't go any further about that, however the objection is overruled." The record does not show whether Betty Ramey did, in fact, take such test.

The defendants now assign these three occurrences as error. It will be observed that, as to the first instance, there was no objection, motion to strike or request for an instruction to the jury; as to the second instance, the court promptly instructed the jury not to consider the statement; and as to the third instance, there was no testimony that Betty Ramey consented to take a polygraph test or that such a test was ever given her. In no instance was there any testimony as to the result of any polygraph test or as to the particular statement of the witness to which any such test related.

Speaking through Justice Branch in *State v. Montgomery*, 291 N.C. 235, 243-244, 229 S.E. 2d 904 (1976), this Court said:

> "It is well settled in this jurisdiction that *the results* of a polygraph test are inadmissible into evidence and that the parties may not be allowed to introduce such results directly or by indirection. (Citations omitted.) However, every reference to a polygraph test does not necessarily result in prejudicial error. *State v. Williams*, 279 N.C. 515, 184 S.E. 2d 282 (1971)." (Emphasis added.)

There is no merit in this assignment of error.

[8] The defendants assign as error the denial of their motion for dismissal or nonsuit. It is elementary that upon such a motion the evidence of the State is deemed to be true and discrepancies and contradictions therein are resolved in favor of the State. Each defendant testified that he did not know Gravely. The testimony of Easter was that he (Easter) was an eyewitness to the shooting of Gravely, that almost immediately upon their entry into the room and without any conversation, except normal salutations, Hawks shot Gravely three times and then, at the direction of Kirkman, shot him again, that Hawks then removed from Gravely's pocket his wallet, pistol and keys. The testimony of Betty Ramey is that Gravely had in his wallet, a short time earlier, several hundred dollar bills. The testimony of Dreama Smith is to the effect that when Kirkman first came to the trailer he and Bet-

ty Ramey had a private conversation, immediately following which both left the trailer. The testimony of Easter is that in about 20 minutes Kirkman and Hawks returned and the shooting then occurred within two or three minutes. This evidence is ample to support a verdict that the defendants, acting in concert, shot and killed Gravely in the perpetration of the felony of robbery and did actually rob him.

[9] The defendants contend that the motion for dismissal should have been allowed because there is a fatal variance between the indictment on the charge of armed robbery and the proof. The indictment of each defendant on the charge of armed robbery is in proper form and states that such defendant, with the use of a .38 caliber pistol whereby the life of Clayton G. Gravely was endangered and threatened, did take, steal and carry away "*approximately* $400.00 in United States currency from the person of Clayton G. Gravely." (Emphasis added.) The defendants' contention is that the only evidence as to what, if anything, was taken from Gravely is the testimony of Easter to the effect that Hawks "reached in his pocket and got his wallet and gun and his keys." This overlooks the testimony of Betty Ramey to the effect that Gravely had in his wallet several hundred dollar bills. Obviously, there is no material variance between the allegation and the proof. It is not necessary that the State prove the taking of the exact amount of money alleged in the indictment. *See*, *State v. Waddell*, 279 N.C. 442, 183 S.E. 2d 644 (1971). Furthermore, judgment was arrested on the charge of armed robbery. The defendants do not contend that there was any variance between the indictments charging murder and the evidence offered by the State.

[10] By Chapter 1201, Session Laws of 1973, Section 1, effective 8 April 1974, nearly two years prior to the killing of Gravely, the General Assembly rewrote G.S. 14-17 to provide that the punishment for murder in the first degree (defined to include a murder committed in the perpetration of or in an attempt to perpetrate any robbery) shall be death, but, by Section 7 of that Act, provided:

> "In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for

any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment."

The United States Supreme Court having so determined in *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), Section 7 of this Act became operative. Thus, the sentence to imprisonment for life was properly imposed. *State v. Warren*, 292 N.C. 235, 232 S.E. 2d 419 (1977). *See also: State v. May*, 292 N.C. 644, 235 S.E. 2d 178 (1977); *State v. Hopper*, 292 N.C. 580, 234 S.E. 2d 580 (1977); *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977); *State v. Dollar*, 292 N.C. 344, 233 S.E. 2d 521 (1977); *State v. Stewart*, 292 N.C. 219, 232 S.E. 2d 443 (1977); *State v. Cousin*, 291 N.C. 413, 230 S.E. 2d 518 (1977). We find no merit in the defendants' contention that to construe the 1973 Act as making life imprisonment the proper sentence for a first degree murder committed prior to the decision in *Woodson v. North Carolina, supra*, would violate the *ex post facto* clause of the State and Federal Constitutions. Constitution of the United States, Article I, § 10; Constitution of North Carolina, Article I, § 16. This assignment of error is overruled.

The defendants have made a number of other assignments of error. We have carefully examined each of these and find no merit in any of them. No useful purpose would be served by a detailed discussion of these other assignments. They are overruled.

The defendants have had a fair trial in accordance with the law of this State. The direct conflict between their own testimony to the effect that neither of them was in the trailer of Betty Ramey at the time Clayton Gravely was shot and killed and the testimony of Easter that he was an eyewitness to the shooting and that the defendants perpetrated it merely raised a question for the jury, which resolved it adversely to the contentions of the defendants.

No error.