STATE OF NORTH CAROLINA v. STEPHEN WAYNE HOLDER

No. 600A90

(Filed 25 June 1992)

1. **Homicide § 678 (NCI4th) — diminished capacity — specific intent to kill — premeditation and deliberation — separate instructions not required**

The trial court in a first degree murder prosecution did not err in failing to give the jury a separate instruction on diminished capacity as it related to defendant's ability to premeditate and deliberate after having instructed on diminished capacity as it related to defendant's ability to form a specific intent to kill since specific intent is a constituent of premeditation and deliberation.

**Am Jur 2d, Homicide §§ 499, 501, 516.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

2. **Criminal Law § 399 (NCI4th) — judge's statement to defense counsel — no comment on defendant's failure to testify**

The trial judge did not express an opinion on defendant's failure to testify when, during a discussion relating to the State's objection to a question asked a witness by defense counsel about defendant's reputation for truthfulness, he stated to defense counsel, "I assume he plans to testify. Have you decided if he's going to testify?" Furthermore, any prejudice was removed by the trial court's explicit instruction that defendant's election not to testify was an exercise of his legal right and should not be considered against him. N.C.G.S. § 8-54.

**Am Jur 2d, Trial § 292.**

**Violation of federal constitutional rule (Griffin v. California) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

3. **Evidence and Witnesses § 1622 (NCI4th) — tape recording — refusal to hold voir dire — sufficient authentication**

Defendant failed to show an abuse of discretion or harm resulting from the trial court's decision not to conduct a voir

dire before the authentication of a tape recording of a phone call allegedly made by defendant to a murder victim shortly before her death where (1) the recording was authenticated by a detective's testimony concerning statements made to him by defendant and by the victim recounting comments on the recording which closely parallel the actual text of defendant's comments on the recording, and (2) the recording was further authenticated by the testimony of two of the victim's friends that they listened to the recording shortly after it was made, that they recognized defendant's voice on the tape, and that the contents of the tape played in court were unaltered. N.C.G.S. § 8C-1, Rules 901(a)(5) and (b)(1).

**Am Jur 2d, Evidence § 436.**

**Admissibility in evidence of sound recording as affected by hearsay and best evidence rules. 58 ALR3d 598.**

4. **Criminal Law § 441 (NCI4th) — prosecutor's jury argument — credibility of psychiatrist — no improper speculation on punishment**

The trial court did not err in failing to intervene *ex mero motu* when the prosecutor argued to the jury that a psychiatrist who testified that defendant was insane when he murdered the victim and recommended psychotherapy as treatment for defendant's problems "wants you to find him not guilty by reason of insanity so he can talk to him for a while, I contend to you. Talk. No medication; nothing," since the prosecutor's remarks did not constitute speculation that there would be no consequences for defendant's actions if the jury concluded that he was insane but were geared to undercut the psychiatrist's credibility by characterizing his treatment recommendation as amounting to little more than talking to defendant about his problems.

**Am Jur 2d, Expert and Opinion Evidence §§ 380-382.**

**Propriety and prejudicial effect of counsel's negative characterization or description of witness during summation of criminal trial — modern cases. 88 ALR4th 209.**

5. **Appeal and Error § 147 (NCI4th) — failure to preserve issue for appeal**

The issue of whether the State attempted to place before the jury a fact not in evidence during cross-examination of

STATE v. HOLDER

[331 N.C. 462 (1992)]

a defense expert witness was not preserved for appellate review where defendant permitted the allegedly improper "fact" to come before the jury without an initial objection; defense counsel merely objected to the form of the State's question, not that the prosecutor was improperly seeking to argue evidence not before the jury; and this specific ground was not apparent from the context of the question. Furthermore, defense counsel's subsequent proper objection did not redeem the initial failure to enter a proper objection. Appellate Rule 10(b)(1).

Am Jur 2d, Trial §§ 424-427, 429.

6. Evidence and Witnesses § 2192 (NCI4th)— hypothetical questions—reasonable inferences from evidence

The prosecutor was not attempting to place before the jury facts not in evidence when he posed hypothetical questions to an expert witness that included as predicate facts reasonable inferences that could be drawn from the evidence before the jury.

Am Jur 2d, Expert and Opinion Evidence §§ 98-116.

Modern status of rules regarding use of hypothetical questions in eliciting opinion of expert witness. 56 ALR3d 300.

7. Criminal Law § 460 (NCI4th)— jury argument—reasonable inferences from evidence

The prosecutor did not attempt to place before the jury facts not in evidence when he argued to the jury that "you can infer from the evidence that [defendant] made those hang up calls to ascertain whether or not [the victim] was there" where the evidence provided a reasonable basis for the prosecutor's inference.

Am Jur 2d, Prosecuting Attorneys § 27.

8. Criminal Law § 18 (NCI4th)— second psychiatric evaluation— uncooperative defendant

The trial court did not err in ordering that defendant submit to a second psychiatric evaluation at Dorothea Dix Hospital where the court found that a second psychiatric evaluation was necessary because defendant was uncooperative during his first evaluation.

Am Jur 2d, Expert and Opinion Evidence § 180.

9. **Evidence and Witnesses §§ 865, 876 (NCI4th)— hearsay — proof that statement made — state of mind exception**

A murder victim's statements to others shortly before her death that defendant refused to leave her alone, that he carried a gun, and that he frightened her with threats of physical violence were not hearsay because they were probative not of the truth of the victim's statements but of the fact that the victim in fact made the statements. Moreover, even if hearsay, the statements were admissible under N.C.G.S. § 8C-1, Rule 803(3) to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder.

**Am Jur 2d, Evidence §§ 497, 650.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed 170.**

10. **Evidence and Witnesses § 1501 (NCI4th)— victim's bloody shirt — bullet holes — illustration of pathologist's testimony**

A bloody shirt worn by a murder victim on the day of the killing was not introduced by the State merely to inflame the jury and was properly admitted in conjunction with the testimony of the pathologist who performed the autopsy on the victim's body where the pathologist articulated the reasons for the examination of clothing worn by gunshot victims and used the shirt to illustrate his testimony as to the location of the holes in the shirt that related to bullet holes in the victim's body, and the shirt was not excessively displayed or discussed.

**Am Jur 2d, Homicide §§ 413, 463.**

**Admissibility, in homicide prosecution, of deceased's clothing worn at time of killing. 68 ALR2d 903.**

11. **Homicide § 441 (NCI4th)— instructions — use of deadly weapon — evidence of lack of specific intent — State's burden not lessened**

The State's burden in a first degree murder case to prove beyond a reasonable doubt that defendant killed the victim with malice was not impermissibly lessened by the court's instruction on the inference of malice from the use of a deadly

STATE v. HOLDER

[331 N.C. 462 (1992)]

weapon or infliction of a fatal wound by means of a deadly weapon where defendant introduced evidence that he lacked the capacity to form the specific intent to kill or inflict serious bodily harm. In determining whether the State proved beyond a reasonable doubt that defendant killed the victim with malice, the jury was entitled to infer malice from defendant's use of a deadly weapon along with other evidence of malice, including defendant's threats to physically harm the victim, countered by evidence presented by defendant that he lacked the capacity to form the specific intent to kill or inflict bodily harm.

**Am Jur 2d, Homicide § 454.**

12. **Criminal Law § 1108 (NCI4th) — felonious assault — aggravating factor — dangerousness to others — sufficiency of evidence**

The evidence supported the trial court's finding as a nonstatutory aggravating factor for assault with a deadly weapon with intent to kill inflicting serious injury that defendant's mental condition rendered him dangerous to other persons where there was expert psychiatric testimony that (1) defendant had a schizotypical personality disorder, making him believe that external forces controlled his behavior, (2) defendant also suffered from a mixed personality disorder which made him paranoid that others were intent on injuring or humiliating him, causing defendant to become angry, abusive and aggressive, (3) defendant also had a borderline personality causing him to have unstable mood swings during which he became angry for no apparent reason, (4) defendant had particular trouble when women terminated romantic relationships with him and would become angry, hostile, and threatening, and (5) these problems were exacerbated by defendant's abuse of marijuana, prescription drugs, and alcohol; and defendant's volatile behavior and violent proclivities were also manifested in numerous anecdotal accounts provided by lay testimony, as well as the fact that defendant customarily carried a gun because "little guys were always getting jumped on." This evidence was sufficient to prove by a preponderance of the evidence that defendant poses a greater threat or danger to other persons than other members of the public convicted of assault with a deadly weapon with intent to kill inflicting serious injury.

**Am Jur 2d, Homicide §§ 568-582.**

STATE v. HOLDER

[331 N.C. 462 (1992)]

13. **Criminal Law § 467 (NCI4th)— closing argument—use of victim's photograph and tape recording—no gross impropriety**

The trial court did not abuse its discretion in failing to intervene *ex mero motu* when, during the closing argument, the prosecutor attached a photograph of a murder victim to the podium in front of the jury box and played a tape recording of defendant's threatening telephone message to the victim since both the photograph and the tape recording were relevant and admissible evidence introduced as exhibits during the trial, and the prosecutor's employment of them was not grossly improper.

**Am Jur 2d, Trial § 666.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

14. **Criminal Law § 1098 (NCI4th)— aggravating factor—same evidence used to prove crime element**

Defendant is entitled to a new sentencing hearing on a kidnapping conviction where the same evidence that was used to prove the "facilitating flight" element of the kidnapping charge was also used to prove the "avoiding or preventing a lawful arrest" aggravating factor employed to impose a sentence greater than the presumptive term.

**Am Jur 2d, Criminal Law § 598.**

Justice WEBB concurring.

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence upon defendant's conviction for first-degree murder entered by *Freeman, J.*, at the 14 May 1990 Criminal Session of Superior Court, GUILFORD County. Defendant's motion to bypass the Court of Appeals, pursuant to N.C.G.S. § 7A-31, as to additional convictions and sentences, was allowed by the Court 20 December 1991. Heard in the Supreme Court 14 April 1992.

*Lacy H. Thornburg, Attorney General, by Thomas F. Moffitt, Special Deputy Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

MEYER, Justice.

On 5 June 1988, defendant was indicted for the first-degree murder of Joyce Varner, assault with a deadly weapon with intent to kill inflicting serious injury on William E. Leitch, and the first-degree kidnapping and robbery with a dangerous weapon of Brian Shipp. Defendant was tried capitally in the Superior Court, Guilford County, in May 1990 and was found guilty of all charges. Subsequent to a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant receive a life sentence for the first-degree murder conviction. The trial court thereafter imposed the life sentence for murder, as well as forty-year sentences for first-degree kidnapping and robbery with a firearm, to run consecutively, and a twenty-year sentence for assault with a deadly weapon with intent to kill inflicting serious injury, to run concurrently with the robbery sentence.

The State's evidence in the guilt phase tended to show the following. Early in 1988, Joyce Varner separated from her husband and lived with her four-year-old daughter, Emily, in an apartment in Greensboro, North Carolina. Ms. Varner, a thirty-year-old employee of the Richardson-Vicks Chemical Company, dated defendant for a short time after her separation. Dissatisfied because defendant wanted the relationship to be more intense than she wished, Varner attempted to terminate the relationship, but defendant refused to leave Varner alone.

Several witnesses testified about defendant's attempts to maintain his relationship with Varner. Cindy Blake, a friend of Varner's, testified that Varner told her that she had dated defendant several times, did not have a serious relationship with him, tried to break it off but could not get rid of defendant, and felt threatened by him. Phillip Purcell, one of the men Varner dated, testified that Varner told him that defendant followed her around, cruised by her house in his car, and left messages and cards on Varner's desk at work. Varner told Purcell that the relationship with defendant was not a serious one but that defendant thought it was, and that Varner became scared when she discovered that defendant carried a gun. Purcell also testified about several incidents wherein defendant threatened or physically molested Varner because he was upset about her seeing other men. Patrick Goldbeck, another man Varner had dated, testified that wherever he and Varner went, defendant always seemed to appear. In particular, he testified

that one evening Varner traveled home by cab only to return shortly thereafter because defendant was following her in another cab and she was afraid to go home alone. Varner went home an hour later and told Goldbeck that she saw the cab circling the block around her house. Goldbeck also testified that on one occasion defendant and Varner had a fight in a bar and that defendant kicked a hole in the fence behind the bar.

Carla Delvitto, Joyce Varner's mother, testified that Varner told her that she had been out with defendant but was afraid of him because he carried a gun and that on one particular Valentine's Day, defendant left flowers at Varner's front door, and Varner threw the flowers in a trash can. Delvitto also testified that in April 1988 she was baby-sitting Emily one evening and saw a car drive by the Varner residence very slowly, turn around in the driveway, drive up the street, turn around, and repeat the process three times. Upon being told of the incident by Delvitto, Varner replied: "Don't worry about that car. It's just Steve. He's still up in the parking lot waiting. He does this quite often. He wants to see who I'm coming home with and what time I come home."

Denise Wetzel, Joyce Varner's older sister, testified about several incidents regarding Varner's relationship with defendant. On one occasion, Wetzel saw defendant grab Varner by the arm merely because a casual acquaintance said "hello" to her. Varner also told Wetzel about numerous phone calls she received in which the caller immediately hung up the phone without speaking and about numerous other calls from defendant in which he interrogated her about men being at her home with her, what time she arrived home, and other personal matters. Wetzel testified that defendant was very possessive and scared Varner.

The State played a message that defendant left on Varner's telephone answering machine on 25 April 1988, which was as follows:

[W]omen around where I suspect you to be at. Now, I expect the same consideration from you. That if you say this being friends or whatever, that excuse is wearing kind of thin as much as you've been around the boy. But, I want to tell you something, you going to wind up flaunting that stuff in front of me and you going to wind up getting yourself and your man friend hurt; or your men friends, whatever the situation may be. I'm tired of it; I'm tired of trying to be nice to you. I've had two months to think about it and you're just a spoiled

woman. That's all there is to it. And there ain't going to be no more being nice. There's no need. I've done tried it and it don't work. So, from now on, when you see me out, expect me to mean business.

After receiving the message, Varner phoned her friends to tell them about it. Cindy Blake, Dennis Wetzel, Patrick Goldbeck, and Chuck Varner listened to the message. They testified that Varner was crying and very shaken by the message.

When Phillip Purcell came home on 26 April 1988, he found Varner and her daughter sitting on the steps to his house. Varner told Purcell that she was scared to return home because she had seen defendant around her house and she was afraid for her life.

Varner had a warrant issued for defendant's arrest for communicating threats to her, and the police arrested defendant on 26 April. As he was being taken to the magistrate's office, defendant raged that he "didn't do nothing to that bitch." When in the magistrate's office, defendant related: "This bitch got me down here on a shit charge, but that's okay. I'll get the bitch."

On 28 April 1988, Detective Allen Travis of the Greensboro police interviewed defendant. Defendant admitted leaving the message on Varner's answering machine in which he told her to "stop bringing her male friends around or someone was going to be hurt."

On the day of the murder, 5 May 1988, Varner got off work at 4:30 p.m. and was picked up by William Leitch, a friend of hers, and her daughter Emily. The three planned to dine together before Leitch was to meet another and drive to his home in Denver, North Carolina. The trio returned to Varner's house, and as they were deciding where to eat, Varner received several hang-up phone calls. They then went out to dinner and arrived home at approximately 8:30 p.m. Just before leaving to drop Leitch off at a meeting place for his ride, Varner received several more hang-up calls. Emily, Varner, and Leitch then entered the car, which was parked in a detached garage next to the house, with Leitch sitting on the passenger's side, Varner driving, and Emily in the back seat. Before leaving, Leitch made a final check in his duffel bag to see if he had collected all his belongings. As he was doing so, he heard a bang or pop as Varner turned the ignition key. As he turned, he saw a gun pointed at him. The gun fired and Leitch

was hit in the face with a bullet. Leitch heard Varner yell, "Stop. Quit, Stephen, quit." After a few seconds, Leitch heard Varner plead, "Help. Stop." Then he saw the gun discharge four more times in rapid succession into Varner's body. Shortly thereafter, Leitch went into the house and summoned the police. Leitch was taken to the hospital, where a bullet was removed from the back of his neck. Emily was not physically harmed but was heard screaming for her mother and was extremely upset.

When the police arrived, at approximately 9:05 p.m., they found Varner, already deceased, lying face down between two cars parked in her garage. The autopsy revealed that Varner had sustained five gunshot wounds. Two bullet wounds in her lower back were fatal, with one bullet penetrating Varner's lung, diaphragm, and liver, and the other penetrating her small intestine, liver, diaphragm, and heart.

At approximately 9:15 p.m. on the night of 5 May, Brian Shipp met defendant and agreed to give defendant a ride to a friend's house. Shipp testified that defendant kissed him and performed oral sex on him. The two thereafter bought some wine coolers at a convenience store and drove to a nearby bridge to urinate. There, defendant exhibited a handgun and demanded Shipp's car keys. Fearful for his safety, Shipp offered defendant money and to take him anywhere he wished to go. The two then traveled north on Interstate 85. As they drove, defendant sat in the passenger's seat with the gun pointed at Shipp. Defendant told Shipp that he eventually wanted to arrive in Canada. Shipp asked defendant what had happened, and defendant told Shipp that he had a fight with his girlfriend and that he shot and killed both her and her new boyfriend. After crossing into Virginia, Shipp noticed that the car was low on gas. Shipp drove to a truck stop and removed the keys from the ignition, telling defendant that he needed the key to open the gas cap. Shipp then ran into the truck stop and hid behind a counter until the police arrived.

On 7 May 1988, defendant was apprehended by the Virginia state police after commandeering a car from a resident in Dillwyn, Virginia. On 19 May 1988, Greensboro police traveled to Virginia and searched the area where defendant was apprehended. They discovered defendant's black leather jacket and a box of .22-caliber bullets. These bullets, along with bullets seized from defendant's residence and those taken from the bodies of Joyce Varner and

William Leitch, were analyzed. Federal Bureau of Investigation ballistics expert Gerald F. Wilkes testified that all of the spent bullets were .22-caliber, long-rifle, brass-coated lead bullets that had been fired from the same gun. He also testified that the bullets seized at defendant's residence and in Virginia were all .22-caliber, long-rifle, brass-coated lead bullets.

Defendant's evidence tended to show that on the evening of the murder, 5 May, defendant drank four double rum and coke mixed drinks and a shot of schnapps at a bar and left before 9:00 p.m. Numerous friends testified on behalf of defendant, most stating that he was a good friend and nonviolent.

Two expert witnesses testified, in effect, that defendant was insane at the time of the killing. Doctor Brad Fisher, a forensic psychiatrist, stated that defendant suffered from depression and a paranoid personality disorder characterized as recurrent and acute that rendered defendant's thinking susceptible to paranoia when defendant was stressed. Fisher testified that defendant had an inability to maintain relationships with women and that when those relationships failed, the stress contributed to paranoid delusions. Fisher related that defendant told him that he had consumed alcohol and the prescription drug Talwin and had smoked marijuana on the evening of the murder. In Fisher's opinion, defendant lacked the capacity to make and carry out plans on 5 May because his thoughts were disorganized and affected by a paranoid delusional sense of the world exacerbated by medications and drinking.

Doctor Billy Royal, a forensic psychiatrist, testified that defendant had problems with obsessiveness; that defendant had great difficulty dealing with terminated relationships with women when they did not desire the intense closeness he desired; and that during such times, defendant became angry, hostile, and threatening. Royal testified that on 5 May, defendant lacked the capacity to distinguish right from wrong and that defendant was incapable of deliberating or forming the intent to kill Varner or Leitch.

Expert witnesses for the State testified, in effect, that defendant was sane at the time of the killings. Doctor Bob Rollins, a forensic psychiatrist at Dorothea Dix Hospital, testified that defendant had a longstanding personality disorder affecting his ability to get along with women and that defendant was distressed at the time of the killing. However, Rollins stated that defendant was able to distinguish right from wrong at the time of the killing

and that defendant had no mental condition that would have prevented him from being able to form the specific intent to kill.

Doctor James Groce, also a forensic psychiatrist at Dorothea Dix Hospital, testified that defendant had a personality disorder with some borderline traits that caused him to decompensate under stress and become paranoid and that defendant was depressed. In Groce's opinion, defendant was able to distinguish right from wrong at the time of the killing. Also, Groce testified that defendant was able to make plans and form the intent to kill and that use of alcohol and drugs would not have rendered defendant incapable of formulating the specific intent to kill. However, on cross-examination, Groce opined that on 5 May, defendant experienced significant depression that would have impaired his ability to appreciate the criminality of his conduct and to conform his behavior to the requirements of the law, and that alcohol and drug use contributed to defendant's decreased judgment and increased impulsivity.

[1] Defendant first argues that the trial court improperly failed to instruct on diminished capacity as it relates to defendant's ability to premeditate and deliberate. In particular, defendant sought to instruct the jury on whether his alleged diminished capacity affected his capacity to form the requisite specific intent for first-degree murder *as well as* his capacity to premeditate and deliberate. The record shows that the trial court agreed to provide defendant's requested instruction "in substance." The court provided the following instruction:

Now, as I told you a little earlier, you may find that there is evidence which tends to show that the defendant was intoxicated and/or drugged and/or that he lacked the mental capacity at the time of the acts alleged in this case. Now, generally, voluntary intoxication or a voluntary drug condition is not a legal excuse for a crime. However, if you find that the defendant was suffering from a combination of intoxication, drug condition and lacking a mental capacity, you should consider whether this condition affected his ability to formulate the specific intent which is required for a conviction of first degree murder. In order for you to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill performed—excuse me,

**STATE v. HOLDER**

[331 N.C. 462 (1992)]

formed after deliberation and premeditation. If, as a result of the combined intoxicated, drugged and lacking mental capacity of the defendant, if, as a result of this, the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, then he is not guilty of first degree murder.

After so instructing the jury, the court asked counsel whether there were "any objections to the jury charge, request[s] for additional instructions or corrections or clarifications." Counsel for the State and for defendant answered in the negative.

It is well settled that when a request is made for a specific instruction that is supported by the evidence and is a correct statement of the law, the court, although not required to give the requested instruction verbatim, must charge the jury in substantial conformity therewith. *State v. Davis*, 291 N.C. 1, 229 S.E.2d 285 (1976). Defendant contends that there was compelling evidence here that the defendant could not premeditate or deliberate and could not form the specific intent to kill. In essence, defendant's argument rests on the premise that intent is an element independent of premeditation or deliberation and that he was entitled to have a separate diminished capacity instruction with regard to each.

In response, the State argues that defendant was not entitled to the requested instruction. In support of its contention, the State cites *State v. Quesinberry*, 319 N.C. 228, 230, 354 S.E.2d 446, 448 (1987), where we noted that while specific intent to kill is a necessary element of first-degree murder, it is also an essential constituent of the elements of premeditation and deliberation. " 'Thus, proof of premeditation and deliberation is also proof of intent to kill.' " *Id.* (quoting *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 839 (1981) ). Given this interrelatedness, the State asserts that the court did not err in instructing only as to intent. We agree.[1]

The language attending the substantive elements of first-degree murder is well known:

---

1. While acknowledging that he failed to lodge an objection in the wake of the allegedly improper instruction, defendant submits that the error was preserved because the instruction was properly requested," he was told by the court that the instruction would be given "in substance," and therefore he complied with the "spirit" of Appellate Rule 10(b)(2). *State v. Pakulski*, 319 N.C. 562, 575, 356 S.E.2d 319, 327 (1987). The State, on the other hand, argues that "plain error" analysis controls. Because we conclude that the reasonable doubt instruction provided by the trial court did not amount to error, we need not decide this issue.

Premeditation means that the defendant formed the specific intent to kill for some length of time, however short, before the actual killing. Deliberation means that the intent to kill was executed in a cool state of blood, without legal provocation, and in furtherance of a fixed design for revenge or to accomplish some unlawful purpose. No particular length of time is required for the mental processes of premeditation and deliberation; it is sufficient that the processes occur prior to, and not simultaneously with, the killing.

*State v. Cummings*, 323 N.C. 181, 188, 372 S.E.2d 541, 547 (1988) (citations omitted), *judgment vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 249, 404 S.E.2d 849 (1991). Thus, specific intent is a constituent of premeditation and deliberation. We therefore conclude that the trial court did not err in its instruction and overrule defendant's assignment of error.

[2] Defendant next argues that the trial judge committed reversible error because he improperly expressed an opinion regarding defendant's failure to testify. Defendant bases his argument on the following exchange:

Q. [By defense counsel, Mr. Elmore] Ms. Ragan, do you have an opinion as to [defendant's] truthfulness in the community?

MR. KIMEL [prosecutor]:— We OBJECT as to his general truthfulness in the community.

THE COURT:— Do you want to rephrase that?

Q. Do you have an opinion as to his reputation for truthfulness and character?

A. I've never—

MR. KIMEL:— Just a minute, ma'am. We maintain that's improper at this time until and unless the defendant puts his truthfulness into evidence, if Your Honor please, i.e., by testimony.

THE COURT:— *I assume he plans to testify. Have you decided if he's going to testify?*

MR. ELMORE [defense counsel]:— Judge, we wouldn't say at this point, but it would certainly corroborate anything she would say at a later time if that were the case. I'll withdraw the question, Your Honor.

THE COURT:— Okay.

MR. ELMORE:— I don't have anything further. Thank you, Ms. Ragan.

(Emphasis added.) No objection was made, nor was any curative instruction requested concerning the court's remark about defendant's plans to testify. As the trial progressed, defendant did not testify, and the court subsequently charged the jury as follows:

> Now, the defendant in this case has not testified, and the law of North Carolina gives him this privilege. This same law also assures him that his decision not to testify creates no presumption against him. Therefore, his silence is not to influence your decision in anyway [sic].

Defendant contends that the court's statements amounted to an improper comment on defendant's decision not to testify and impermissibly gave the jury the impression that the trial court thought it best if the defendant were to testify. According to defendant, this violated his right to remain silent and not take the stand in his own defense. N.C.G.S. § 8-54 (1988).

We disagree. Examination of the record reveals that the trial judge's comment was not directed to defendant's failure to testify; he did not specifically advert to defendant's failure to testify. Nor is it likely that an average juror would interpret the court's remark otherwise. *State v. Taylor*, 289 N.C. 223, 228, 221 S.E.2d 359, 363 (1976); *State v. Hughes*, 54 N.C. App. 117, 122, 282 S.E.2d 504, 508 (1981). Furthermore, any prejudice was removed by the trial court's explicit instruction that defendant's election not to testify was an exercise of his legal right and should not be considered against him. *State v. Lindsay*, 278 N.C. 293, 179 S.E.2d 364 (1971).

[3] Next, defendant argues that the trial court erred in admitting, over defendant's objection and request for a voir dire, a tape recording of a phone call allegedly made by defendant to the victim shortly before her death. Defendant contends that because the court refused his request for a voir dire, he was wrongly denied the opportunity to fully explore and question the reliability and authenticity of the tape. A transcript of the message, which provided as follows, was submitted to the jury:

> [W]omen around where I suspect you to be at. Now, I expect the same consideration from you. That if you say this being

friends or whatever, that excuse is wearing kind of thin as much as you've been around the boy. But, I want to tell you something, you going to wind up flaunting that stuff in front of me and you going to wind up getting yourself and your man friend hurt; or your men friends, whatever the situation may be. I'm tired of it; I'm tired of trying to be nice to you. I've had two months to think about it and you're just a spoiled woman. That's all there is to it. And there ain't going to be no more being nice. There's no need. I've done tried it and it don't work. So, from now on, when you see me out, expect me to mean business.

We conclude that the trial court did not err in this regard. N.C.G.S. § 8C-1, Rule 901 governs the authentication requirements of such recordings. *State v. Stager*, 329 N.C. 278, 317, 406 S.E.2d 876, 898 (1991). Rule 901(b) provides by way of illustration numerous means of authentication. Within this nonexclusive list, the legislature provided that recordings may be authenticated by means of testimony by a witness who has knowledge that a matter is what it is claimed to be, Rule 901(b)(1), and by means of voice identification, Rule 901(a)(5). Here, Detective Travis of the Greensboro police testified that defendant admitted to him that he made the phone call to Varner on 25 April 1988 because she was "running men in front of him," that her behavior had made him very mad, and that he left a message on the victim's answering machine telling her to "stop bringing her male friends around or someone was going to get hurt." The following day, the victim herself contacted Travis, and Travis testified that "she had came [sic] home one night and found a message on her telephone recorder in which words to the effect that said, 'When I see you out, I just want you to know that you and your male friends are going to get hurt, and I mean business.'" These statements closely parallel the actual text of defendant's comments on the recording, and the witness' testimony suffices to authenticate the recording. Moreover, witnesses Blake and Goldbeck, both friends of the victim who were acquainted with the defendant, testified that they listened to the recording shortly after it was made, that they recognized defendant's voice on the tape, and that the contents of the tape played in court were unaltered from when they first heard the tape in April 1988. This testimony constituted an independent basis of authentication. Therefore, defendant is unable to show either an abuse of discretion or harm resulting from not having a voir dire hearing before the

tape recording was authenticated, and any error emanating from the trial court's decision not to conduct a voir dire is harmless. We therefore overrule defendant's assignment of error.

[4]   In his next assignment of error, defendant argues that the trial court erred when it failed to intervene *ex mero motu* to censor remarks made by the State during its closing argument. The statement by the prosecutor concerned remarks made by Doctor Billy Royal, who stated that defendant was not responsible for his actions because he was insane when he murdered Joyce Varner. Doctor Royal recommended psychotherapy as treatment for defendant's problems. During his final argument, the prosecutor remarked:

> And you know, you go through all this. Doctor Royal gives his opinion: "He's insane. You know, he probably did these acts; he murdered this woman; he shot this man; he probably did these other things, but in my opinion, you know, he's just not responsible." I said, "Well, Doctor Royal, you know, if he's not responsible for murdering this woman and shooting this man and robbing this fellow, what kind of treatment do you recommend for him?" Do you know what he said? Remember that? Psychotherapy. Do you know what psychotherapy is? Talk. He wants to talk to him. That's what Dr. Royal's opinions were. *He wants you to find him not guilty by reason of insanity so he can talk to him for a while, I contend to you. Talk. No medication; nothing. Just, "I want to talk to him."* Psychotherapy.

(Emphasis added.)

Defendant argues that the above argument prejudiced the jury and amounted to an inaccurate statement of the law, insofar as it effectively informed the jury that if it concluded that defendant was insane, there would be no consequences for his actions. Citing *State v. Jones*, 296 N.C. 495, 502, 251 S.E.2d 425, 429 (1979), defendant contends that although counsel may inform the jury of the punishment for an offense, counsel may not speculate on the outcome of possible appeals, paroles, executive commutations, or pardons. The prosecutor's remarks here, defendant argues, were the functional equivalent of that condemned in *Jones*, and the trial court was therefore obliged to intervene *ex mero motu*. We disagree.

**STATE v. HOLDER**

[331 N.C. 462 (1992)]

The prosecutor's remarks were not geared toward speculating on the punishment to be meted out by the judicial system upon conviction; rather, the thrust of his remarks was to undercut Doctor Royal's credibility by characterizing his treatment recommendation as amounting to little more than talking to defendant about his problems. Given the wide latitude prosecutors are granted in the scope of their arguments, such remarks were not so grossly improper as to require the trial court to intervene *ex mero motu.* *State v. Rogers,* 323 N.C. 658, 664, 374 S.E.2d 852, 856 (1989).

[5] In his fifth assignment of error, defendant argues that the State acted improperly in that it attempted to place before the jury facts that were not in evidence during both the State's cross-examination of a defense expert witness and the State's final argument. As for the cross-examination, the record reveals that Doctor Brad Fisher, a psychiatrist serving as a defense witness, testified that defendant could not think coherently when the crimes were committed. The following exchange transpired:

Q. And wouldn't you call that—wouldn't that reach the standard of coherent thinking, if you were able to call someone up and say, "The next time I catch you and your boyfriend out, I'm going to do something to you," and then, do something to them? Isn't that coherent thinking, Doctor?

A. I guess that is open to interpretation. My opinion is that it is not. That was indicative of a person whose thinking was based on a delusional system, was paranoid, and was not fair, but [the recording] said what it said.

Q. I understand. And Doctor, calling someone on the night of May 5, 1988, and hanging up before you went over there, to make sure they were there, that would be some evidence of coherent thinking, wouldn't it, Doctor—

MR. ELMORE:— OBJECTION to the form of the question.

MR. KIMEL:— It's cross examination. It's in evidence.

THE COURT:— Well, OVERRULED. Go ahead. You can answer that.

A. Well, I frankly hadn't thought about that specific thing before, but the idea that you would call and hang up the phone, I think that's one possible—there's more than one possible

**STATE v. HOLDER**

[331 N.C. 462 (1992)]

interpretation for exactly what that meant, but yes, one interpretation of that would be to make sure the person was there.

Q. But that is a rational interpretation, isn't it?

A. That—that's—yes.

Somewhat later, a similar exchange occurred:

Q. Doctor, would you just, based on that answer there, would you consider it a step by step thing to threaten someone with physical violence, to phone call them and make sure they were there—

MR. ELMORE:— OBJECTION, Your Honor. That's an interpretation of the evidence that he sees fit to interpret.

MR. KIMEL:— It's a question for his expert, Your Honor, on cross examination.

MR. ELMORE:— There's no evidence as to who made phone calls or—

THE COURT:— Well, OVERRULED. Go ahead, please.

On the basis of the above cross-examination, defendant argues that the trial court erred in allowing the State's questions because there was no evidence presented as to the identity of the individual who telephoned Joyce Varner just prior to her death. While conceding that it was proper for the prosecutor to argue that the jury could infer that the calls had been made by defendant, defendant contends that it was improper for the State to use the inference as a "fact" upon which the jury could infer premeditation and deliberation. We disagree.

As a threshold matter, as shown above, defendant permitted the allegedly improper "fact" to come before the jury without an initial objection; defense counsel merely objected to the "form" of the State's question, not that the prosecutor was improperly seeking to argue evidence not before the jury. "In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating *the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.*" N.C. R. App. P. 10(b)(1) (emphasis added). Here, it cannot be said that the "specific grounds were . . . apparent from the context." *Id.* Moreover, "[i]t is well established that the admission of evidence

without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979). Therefore, defense counsel's subsequent proper objection did not redeem the initial failure to enter a proper objection. Because defendant waived his prior objection, this assignment is overruled.

[6] Assuming *arguendo* that no waiver occurred, we do not deem the prosecutor's line of questioning to have been in error. The record shows that the prosecutor was not attempting to place before jurors facts not in evidence. Rather, he posed hypothetical questions to an expert witness that included as predicate facts reasonable inferences that could be drawn from the evidence before the jury.

> A hypothetical question may include only such facts as are in evidence or such as the jury will be justified in inferring from the evidence. . . . [T]he interrogator may form his hypothetical question on any theory which can be deduced from the evidence and select as a predicate therefor such facts as the evidence reasonably tends to prove.

*Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 243, 311 S.E.2d 559, 570 (1984) (citations omitted). The evidence before the jury of defendant's erratic behavior with regard to Joyce Varner leading up to the murder of Ms. Varner suffices as a reasonable basis for the prosecutor's questions here. Moreover, the testimony of William Leitch, while not explicitly stating that defendant made the phone calls, provided a reasonable basis on which to predicate an inference such as that raised by the State in this instance.

[7] As for the allegedly improper final argument, the record reveals that the prosecutor addressed the jury as follows:

> I contend to you [that defendant] followed a pattern that he had all the way through his relationship with Joyce Varner. *I contend to you that you can infer from the evidence that he made those hang up calls to ascertain whether or not she was there.* That's what he did. He would always call her to see whether she was there. On this case, he had more of a reason, because he knew that a man had picked her up at work that day, and he'd seen her, and that really made him mad. He went right straight to Annabelle's in the normal course of what he was doing. There are phones there. And

he broke his pattern a little bit, because something was happening.

(Emphasis added.) Defendant failed to object to the allegedly improper argument.

We conclude, once again, that the State did not attempt to place before the jury facts not supported by the evidence. It is well settled that trial counsel are given wide latitude in jury argument and "may argue the law and the facts in evidence and all reasonable inferences drawn from them." *State v. Kirkley*, 308 N.C. 196, 212, 302 S.E.2d 144, 153 (1983), *rev'd on other grounds*, *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988); *see also State v. Craig*, 308 N.C. 446, 454-55, 302 S.E.2d 740, 745 (1983). Further, because defendant failed to object to the closing argument, the standard of review is one of "gross impropriety." *Craig*, 308 N.C. at 454, 302 S.E.2d at 745. Here, as discussed above, there existed a reasonable basis on which the prosecutor based his inference; therefore, the argument did not constitute a "gross impropriety," and the trial court did not abuse its discretion in failing to intervene *ex mero motu*. For this reason, we overrule this assignment of error.

[8] In his next assignment of error, defendant contends that the trial court erred in acceding to a request by the State for a second psychiatric examination of defendant and subsequently admitting into evidence testimony regarding the second examination. The factual background attending this claimed error is as follows. On 23 February 1990, defendant notified the State of his intent to raise an insanity defense and to introduce expert testimony in support. On 19 March 1990, the trial court ordered that defendant be examined at Dorothea Dix to ascertain whether he was sane when the crimes were committed. The examining psychiatrist, Doctor Bob Rollins, reported to the court as follows:

My evaluation of Mr. Holder is limited in that he declines to provide information about his condition on or about the time of the alleged crime, his involvement in those events, and his relationship with the victim. Additionally, I requested, but did not obtain, reports from the other two clinician[s], Dr. Royal, and Dr. Fisher who are said to have examined Mr. Holder. Also, Mr. Holder's attorney did not furnish us any information.

Doctor Rollins also stated that defendant provided little information, refused to take laboratory tests, and answered questions on the Minnesota Multiphasic Personality Inventory so that the results were invalid.

The State moved to strike defendant's insanity defense because of his failure to cooperate and, in the alternative, moved to have defendant reexamined. After a hearing, the court found as facts that defendant had not been sufficiently forthcoming about the events surrounding the murder and his relationship with the victim and that defendant refused to participate in laboratory testing. On this basis, the court ordered that defendant be returned to Dorothea Dix for further examination. Defendant's second examination, conducted by Doctor Groce, revealed that defendant was experiencing significant depression exacerbated by substance abuse such as to cause impairment but that defendant was sane at the time the crimes were committed.

Defendant concedes that the court was empowered to order the initial examination but argues that the court erred in ordering the reexamination. Rather than requiring the defendant to undergo an additional examination, defendant contends that the court should have stricken the insanity defense. We disagree. In *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *judgment vacated on other grounds*, --- U.S. ---, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991), we discussed the parameters of the court's power to order additional psychiatric examinations:

> The conclusions of any mental health expert, his diagnoses and postdictions, are only as reliable as the data on which those conclusions are based. If there is reason to believe that defendant's evaluation was based on incomplete or distorted data, then there is good reason to reevaluate the individual in light of more complete or more accurate data. The skill of the clinician interpreting the raw data can also affect the validity of a diagnosis or other clinical judgment. Furthermore, retesting is often useful in defining the parameters of a mental illness. Although the underlying condition may always be present, the mental illness may over time manifest itself with symptoms of varying intensity. Knowing the parameters of the illness may increase the reliability of an expert's postdictions about a defendant's mental condition.

*Id.* at 46, 381 S.E.2d at 661. Here, the trial court found that defendant was insufficiently cooperative, and for this reason, a second psychiatric evaluation was necessary. We therefore conclude that the court did not err in ordering that defendant submit to a second psychiatric examination. Moreover, because the court acted properly in ordering the reexamination, no error occurred in allowing into evidence testimony concerning defendant's sanity at the time of the murder.

[9] Defendant next argues that the trial court, over defense objections, improperly admitted hearsay statements of several witnesses who testified as to what the victim had told them. These statements were to the effect that the victim had said that she had seen a small handgun in the defendant's pocket, that defendant had threatened her with physical harm and that she was scared, and that the defendant refused to leave her alone after she had tried to end the relationship. Defendant submits that the hearsay statements were improperly admitted and prejudiced his trial.

We conclude that the trial court did not err in admitting into evidence the victim's statements to witnesses shortly before she was murdered. As a threshold matter, the statements admitted over objection did not amount to hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*." N.C.G.S. § 8C-1, Rule 801(c) (1988) (emphasis added). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard*, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). "The Hearsay Rule does not preclude a witness from testifying as to a statement made by another person when the purpose of the evidence is not to show the truth of such statement but merely to show that the statement was, in fact, made." *State v. Kirkman*, 293 N.C. 447, 455, 238 S.E.2d 456, 461 (1977). Here, the testimony was probative not of the truth of Varner's statements to the witnesses, but rather was probative of the fact that Varner in fact made the statements.

Moreover, even if hearsay, the statements were admissible under the state-of-mind exception to the hearsay rule. This rule provides as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind . . . (such as intent, plan, motive, design . . . ), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

N.C.G.S. § 8C-1, Rule 803(3) (1988). " 'Evidence tending to show state of mind is admissible as long as the declarant's state of mind is a relevant issue and the possible prejudicial effect of the evidence does not outweigh its probative value.' " *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (quoting *Griffin v. Griffin*, 81 N.C. App. 665, 669, 344 S.E.2d 828, 831 (1986) ). Here, the victim's statements to others that defendant refused to leave her alone, that he carried a gun, and that he frightened her with threats of physical violence were admissible under Rule 803(3), as they tended to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder. Varner's state of mind is highly relevant, as it relates directly to the status of her relationship with defendant prior to her death. *See Cummings*, 326 N.C. at 313, 389 S.E.2d at 74. The probative value of this testimony outweighed any potential prejudice to defendant. *Id.*

[10] Defendant next argues that he was unfairly prejudiced by the admission, over defense objection, of a bloody shirt worn by the victim on the day of the killing. The shirt was introduced in conjunction with the testimony of Doctor Robert Thompson, the forensic pathologist who performed the autopsy on the victim's body. Doctor Thompson testified that the clothing worn by gunshot victims is customarily examined:

[I]n cases such as this, when there have been gunshot wounds, we look at the clothing to see what holes might have been caused by the bullets, and as I mentioned, we examine the clothing to see if there's any powder, gunshot powder, on the clothing, and sometimes, it's useful or it's helpful to help to determine which is entrance and is exits [sic]. So, these are the general reasons that we examine the clothing in a gunshot wound case.

Doctor Thompson further testified that such clothing is examined to determine if the holes in clothing correspond with the bullet holes in the body. Thompson identified the material on the victim's shirt as blood and used the bloody shirt to illustrate his testimony as to the location of the holes in the shirt that related to the bullet holes in the victim's body. Defendant argues that the shirt was introduced as a disingenuous bad faith attempt to inflame the jury, given that there was no dispute as to the cause of the victim's death.

Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1988). "In general, the exclusion of evidence under the balancing test of Rule 403 . . . is within the trial court's sound discretion. . . . Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). We conclude that no such abuse occurred in the instant case. Doctor Thompson articulated the reasons undergirding the use of such clothing in autopsies, and he used the shirt to illustrate and corroborate his testimony. Moreover, the shirt was not excessively displayed or discussed; with the exception of the chain of custody testimony of Detective Caldwell, the shirt was not mentioned again after the Thompson testimony. Nor is there any basis of support for defendant's contention that the State introduced the shirt in bad faith.

[11] Defendant next assigns error to the following instruction given by the trial court:

If the State proved beyond a reasonable doubt that the defendant killed the victim with a deadly weapon, or intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused the victim's death, you may infer, first, that the killing was unlawful, and second, that it was done with malice, but you're not compelled to do so. You may consider this, together with all the other facts and circumstances, in determining whether the killing was unlawful and whether it was done with malice. And, of course, a firearm is a deadly weapon.

**STATE v. HOLDER**

[331 N.C. 462 (1992)]

While acknowledging that the above instruction accords with N.C.P.I.—Crim. 206.10, defendant argues that the instruction was erroneous because the State cannot rely upon the inference of malice after the defendant introduces evidence that challenges the inference. To do so, defendant argues, impermissibly lessens the State's burden of proving each element of the crime charged be- yond a reasonable doubt. *Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344 (1985). According to defendant, malice presupposes the existence of intent, and because there was much evidence that defendant lacked the specific intent to kill, it was error for the court to instruct on the inference of malice from the use of a deadly weapon or infliction of a fatal wound by means of a deadly weapon.

We reject defendant's argument. It is well settled that an instruction to the jury that the law implies malice and unlawfulness from the intentional use of a deadly weapon proximately resulting in death is not a conclusive irrebuttable presumption. *State v. Reynolds*, 307 N.C. 184, 297 S.E.2d 532 (1982). In *State v. Forrest*, 321 N.C. 186, 362 S.E.2d 252 (1987), we said the following with regard to a jury instruction substantially similar to that used here:

> Significantly, the trial court did not instruct the jury that malice should be *presumed.* On the contrary, the trial court instructed the jury that it *"may infer"* that the killing was unlawful and committed with malice, but that it was not com- pelled to do so. The trial court properly instructed the jury that it should consider this permissive inference along with all the other facts and circumstances . . . in deciding whether the State had proven malice beyond a reasonable doubt.

*Id.* at 191-92, 362 S.E.2d at 255. In the presence of evidence raising an issue on the existence of malice and unlawfulness, a permissible inference of malice arises that the jury may accept or reject along with other evidence of malice. *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). Here, there was substantial evidence of malice on the part of defendant. Less than a week before the murder, defendant threatened the victim with physical harm in a message recorded on her telephone answering machine. Defendant also threatened the victim at the magistrate's office after his arrest for the tape-recorded threat, saying "[t]his bitch got me down here on a shit charge, but that's okay. I'll get the bitch." On this basis, the jury was entitled to infer malice from defendant's use of a

deadly weapon along with other evidence of malice, countered by evidence presented by defendant tending to show that he lacked the capacity to form the specific intent to kill or inflict serious bodily harm, to determine if the State proved beyond a reasonable doubt that defendant killed the victim with malice. Thus, the State's burden to prove that defendant killed the victim with malice beyond a reasonable doubt was not impermissibly lessened, and therefore no error occurred.

[12] Defendant next argues that the trial court erred in sentencing defendant to twenty years' imprisonment for assault with a deadly weapon with intent to kill inflicting serious injury on William Leitch on the basis of a nonstatutory aggravating factor that defendant's mental condition rendered him dangerous to other persons. In particular, defendant contends that he is entitled to a new sentencing hearing, arguing that there was insufficient evidence to support the factor because there was no evidence that defendant had assaulted another in the past or that defendant would do so in the future.

In order to support the nonstatutory aggravating factor that defendant poses a dangerous threat to others, the State must prove by a preponderance of the evidence that defendant poses a greater threat or danger to other persons than other members of the public convicted of assault with a deadly weapon with intent to kill inflicting serious injury. *State v. Vaught*, 318 N.C. 480, 486, 349 S.E.2d 583, 587 (1986). Here, extensive expert psychiatric testimony showed that defendant posed an unusual threat to the public. Doctor Billy Royal testified that defendant had a schizotypical personality disorder, making defendant believe that external forces controlled his behavior. According to Doctor Royal, defendant also suffered from a mixed personality disorder which made him paranoid that others were intent on injuring or humiliating him, causing defendant to become angry, abusive and aggressive. Defendant also had a borderline personality causing defendant to have unstable mood swings during which he became angry for no apparent reason. Doctor Royal testified that defendant had particular trouble when women terminated romantic relationships with him and that defendant would become angry, hostile, and threatening, sometimes threatening homicide or suicide. Exacerbating these problems, defendant also abused marijuana, prescription drugs, and alcohol. Defendant's volatile behavior and violent proclivities were also manifested in numerous anecdotal accounts provided by lay testi-

mony, as well as the fact that defendant customarily carried a gun because "little guys were always getting jumped on." On this basis, we conclude that the trial court did not err in finding as an aggravating factor that defendant's mental condition caused defendant to be a threat to others.

[13] Finally, defendant argues that the trial court erred in failing to strike *ex mero motu* a portion of the State's final argument to the jury. During the closing argument, the prosecutor attached a photograph of Joyce Varner to the podium in front of the jury box, played the tape recording of defendant's threatening message, and related the following:

 . Now, Ms. Varner suffered a lot, I contend to you, and she—you know, you deserve to see her, I contend, and what I want to do, just look at this picture while I show you the last words—I'm going to sit down. Look at that picture as you listen to the last words that this woman heard right here . . . .

Both the recording and the photo were introduced as exhibits during the trial. Moreover, defense counsel failed to object to the closing argument. Nevertheless, defendant now argues that the State's behavior amounted to a "theatrical trick" and that he was prejudiced when the court failed to intervene *ex mero motu*.

In deciding whether the trial court improperly failed to intervene *ex mero motu* to correct an allegedly improper argument of counsel at final argument, our review is limited to discerning whether the statements were so grossly improper that the trial judge abused his discretion in failing to intervene. *State v. Hamlet*, 312 N.C. 162, 172, 321 S.E.2d 837, 844 (1984). This same analytic framework applies to alleged prosecutorial misconduct in the display of evidence to the jury at final argument. *State v. Robinson*, 327 N.C. 346, 359, 395 S.E.2d 402, 409 (1990). We find no abuse of discretion here. Both the tape recording and the photo were relevant and admissible evidence, seen by the jury during the trial. The State's employment of the tape recording and the photo were not so grossly improper as to have us conclude that the trial court abused its discretion in failing to intervene *ex mero motu*.

[14] Subsequent to oral arguments in this case, defendant filed a Motion to Suspend the Rules of Appellate Procedure and Amend the Record and Brief. In that motion, defendant argued that the same evidence that was used to prove the "facilitating flight" ele-

ment of the kidnapping charge was used to prove the "avoiding or preventing a lawful arrest" aggravating factor to impose a sentence greater than the presumptive on the kidnapping conviction. N.C.G.S. §§ 14-39(a)(2) (Supp. 1991), 15A-1340.4(a)(1)(b) (Supp. 1991). According to defendant, the sentencing proceeding violated the requirement in our Fair Sentencing Act that "[e]vidence necessary to prove an element of the offense may not be used to prove any factor in aggravation." N.C.G.S. § 15A-1340.4(a)(1) (Supp. 1991). In its response to defendant's motion, the State argues that defendant waived this alleged error but that in the event this Court suspends the rules and allows the filing of the motion, it cannot distinguish between the evidence used to prove the offense and the aggravating factor. We hereby suspend the rules and allow defendant's motion. In view of the State's concession of error, we vacate the forty-year consecutive sentence imposed for the kidnapping conviction and remand the case to the Superior Court, Guilford County, for resentencing upon defendant's conviction for kidnapping.

For the reasons stated above, we therefore hold that defendant's sentences for first-degree murder, robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury were free of prejudicial error. Defendant's sentence for first-degree kidnapping is contrary to the law and is therefore remanded to Superior Court, Guilford County, for proceedings not inconsistent with this opinion.

No. 88CRS36131, first-degree murder: no error.

No. 88CRS36132, robbery with a dangerous weapon: no error.

No. 88CRS36133, first-degree kidnapping: no error in the guilt phase; sentence vacated and case remanded for resentencing.

No. 88CRS36134, assault with a deadly weapon with intent to kill inflicting serious injury: no error.

Justice WEBB concurring.

I concur with the result reached by the majority but I do not agree with its rationale that certain testimony was not hearsay. The defendant assigned error to the testimony of certain witnesses as to what the victim had told them—to wit, that she had seen a small handgun in the defendant's pocket, that the defendant had

threatened her and she was afraid, and that the defendant refused to leave her alone after she had tried to end their relationship. The defendant contends this was inadmissible hearsay testimony.

I cannot agree with the majority that this is not hearsay testimony. The majority says the testimony was not introduced to prove the truth of the statements but to prove the victim made them. While it is true that this testimony was introduced to show the victim made the statements, it is obvious to me that the reason the State wanted to prove the victim made the statements was so that the jury would believe the defendant carried a pistol, that the victim was afraid of the defendant, and the defendant refused to leave the victim alone. This makes the testimony hearsay.

I also do not believe the testimony was admissible under the state of mind exception to the hearsay rule. The victim's state of mind was not relevant to any issue in the case.

I do not believe this error was prejudicial because there was substantial other evidence introduced to prove the matters proved by this hearsay testimony. For that reason, I vote with the majority.